GEORGE M. LaMONTE, as commissioner, &c., complainant,

*v.*

HARVEY MOTT et al., defendants.

[Argued March term, 1921. Decided October 18th, 1921.]

Appeal of Edward D. Dunn.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Stevens, who filed the following opinion:

"This is a suit brought by the commissioner of banking and insurance in the company's name against the directors of the in-

solvent Roseville Trust Company to subject them to liability be-
cause of their negligent conduct of its business.

"The company was organized in July, 1908. It commenced
business on December 1st, 1908. On August 13th, 1913, the
commissioner of banking, concluding that it was unsafe for the
company to continue, took possession of its property and assets
under the authority conferred by the act concerning trust com-
panies (*Comp. Stat. p. 5654*), as amended by the act of 1913.
*P. L. 1913 p. 282.*

"As of that date, Mr. Vredenburgh, the commissioner's ex-
aminer, found that on the face of the general ledger the liabilities
of the company appeared to be $985,541.05, a figure which in-
cluded the capital stock [$100,000], and that the resources ap-
peared to be $985,420.92. On that day, however, had the ledger
been properly posted, the liabilities would have appeared to be
$1,237,816.11, and the deficit $393,848.05. But this would not
have represented the true deficit for the books, other than the
general ledger, misrepresented the total deposits, which were
much greater in amount than the books showed, while the assets
were overvalued. The bill charges a deficit exceeding $600,000.

"It is unnecessary now to specify with particularity what was
realized from the assets. It is enough to say that the commis-
sioner obtained by sale or otherwise $657,437.59. He compro-
mised with nine of the directors, viz., Odell, Sexton, Kilgus, Mc-
Cord, Woodward, Fairlie, Bell and William and James Banister;
and received in cash from eight of them $86,703.11. Three of
them surrendered claims against the company amounting to
$53,796.89.

"This gives a general view of the situation. The present suit
is brought against those of the directors who have not com-
promised. Speaking, generally, the losses are of two kinds.
First, those arising from bad debts. Smith, the treasurer, and,
occasionally, the directors themselves, lent to persons or corpora-
tions who, by reason of their insolvency, cannot now be made to
pay. Second, those arising from abstractions or wrongful appli-
cations of the company's money by Smith. These abstractions
represent the greater part of the deficit, and he continued to
make them without discovery for about two years.

"The claim to hold the directors liable for Smith's acts is two-fold—*first,* that almost from the beginning they were advised that he was not to be trusted and that they continued, nevertheless, to trust him; *second,* that the defalcations would have been discovered had due care been taken to examine the books and accounts and to supervise Smith's acts.

"The first contention lies at the foundation of the case and colors the whole of it. The facts upon which it is based are the following: The company was organized to do business in that part of Newark commonly called Roseville. Mr. G. Rowland Munroe was appointed by the organization committee to inquire about Mr. Smith, who had been brought to its attention by Mr. Bryan, a national bank examiner. Smith was then assistant cashier of the Second National Bank of East Orange. Mr. Munroe saw Mr. Calhoun, the attorney for that bank, and also three other gentlemen—one a lawyer, one the owner of the Second National Bank building, and the third, one of its directors. He does not testify that he saw any of the officers of that bank. This was an omission of some importance, in view of the fact that he was, shortly after Smith's appointment, told by State Bank Examiner Appleton that it was rumored that, in the words of Mr. Odell, there 'had been fault found up there about him,' or, as Mr. Munroe seems to admit, that 'his record had been bad.'

"On November 30th, 1908, the directors met, organized and elected Smith secretary and treasurer. The first examination of the company by the banking department was made by Mr. Appleton in March following. He reported to Mr. Lewis, then commissioner of banking, who thereupon wrote as follows:

'May 14, 1909.

" 'William P. Odell, Esq., President,
    The Roseville Trust Company,
        Newark, N. J.

" 'Dear Sir:

" 'The report on the official examination of your company as of March 11th last, which recently came to hand, shows a condition of affairs which is by no means satisfactory to this department. The most serious matter is the use by the treasurer, Mr. Smith, of the company's funds, without the knowledge of the other officers or directors, for the benefit of one of his friends. The facts are reported to be as follows:

" 'On February 6th last Mr. Smith drew a draft on the New York State National Bank of Albany, to the order of Charles A. Nones, for $1,350, which was endorsed by the latter and given by him to one Edward G. Johns, said to be a New York broker, who deposited it to his [Johns] credit in the National Copper Bank of New York. The account of the New York State National was not credited with this draft until a week later, February 13th, when two checks were drawn on the Philadelphia National Bank of Philadelphia, one for $1,350 and the other for $1,000. The account of the New York State National was then credited with the $1,350, and an additional $1,000 in cash was handed to Nones. For neither of these checks, of $1,350 and $1,000, drawn on the Philadelphia National Bank, was there any credit made on the books of your company, but the total amount, $2,350, was charged to the Philadelphia National, thus covering the credit of $1,350 to the account of the New York State National and the handing out of the $1,000 in cash; hence, at the date of the examination the company's account with the Philadelphia National showed a shortage of $2,350.

" 'The examination was made on Friday, March 12th, but no word was dropped by Treasurer Smith of this shortage at that time, although he evidently realized that it must come out in the course of the examination. On Sunday, March 14th, Mr. Smith called the examiner up at his home by telephone, and made arrangements to see the latter the following Tuesday evening, March 16th, when he confessed the whole matter to the examiner and stated that he had made a similar confession to yourself and Mr. Munroe, a director and attorney of the bank, on the Saturday following the examination. The explanation offered by Mr. Smith was that Nones, a friend of his, had come to him on February 6th, stating that he must have $1,350, and that he [Mr. Smith] had advanced Nones the money in this manner, taking the note of the latter for the amount. As Nones already had in the bank $6,000 of paper, of which only $3,500 was known to any of the directors of the company, the other $2,500 having been put in by Treasurer Smith without reporting it to the board or executive committee, he [Mr. Smith], therefore, did not put the $1,350 through as a loan, but allowed it to stand without any entry upon his books, thus making a deficit of $1,350 in the company's Albany account.

" 'On February 13th, one week later, Nones again came to Mr. Smith and stated that he could not pay the $1,350 as agreed, but that he must have another $1,000, and in order to accomplish this, Mr. Smith drew the two drafts above mentioned, for $1,350 and $1,000, on the company's Philadelphia correspondent [the Philadelphia National Bank], giving Nones the $1,000 in cash, and with the other draft, $1,350, crediting the Albany account, so that all the shortage would be in one account. Mr. Smith then received another account from Nones for the $1,000, which he also failed to put through. This left a shortage in the Philadelphia National Bank account from that date, February 13th, to the date of his examination, of $2,350, which difference showed in the examiners' reconcilement of the account with the Philadelphia National for the 11th of March, the date of the examination.

" 'The reason for transferring this shortage to the Philadelphia National Bank is apparent when it is stated that the company has no regular

draft book on that bank [it has such a book in the cases of its other correspondents], only ordinary bank drafts being used for the purpose of drawing on Philadelphia, the stubs not being filled in, hence there were no telltale stubs to show these two transactions.

" 'On April 6th, when the examiner returned to the trust company's office for the purpose of making certain verifications, all the drafts on the various correspondents being then on hand to March 31st, a full comparison of all the paid drafts was made with the stubs of the check books, where there were any such, and with the general cash book, to see the various dates that the credits were made to the banks upon which the drafts were drawn. This led to the discovery that the above transactions with Nones were not the first of the kind, but that similar transactions had occurred in December and January. Another peculiar feature discovered was that where such transactions had been the stubs of the checks were blank, having neither name, account nor date. The examiner also noted that those checks all found their way to the above-mentioned Edward G. Johns, said to be a broker.

· " 'No mention was made by Treasurer Smith of these earlier transactions to either the officers of the company or to the examiner, and when his attention was called to the same he admitted the fact and said that previously Nones had always made good, while this last time he had not.

·" 'Taking the various matters together they seem to disprove the statement of Treasurer Smith that he had no interest in any of the transactions and that they were all made out of friendship for Nones. But be this as it may, no sufficient excuse can be offered by Mr. Smith for his action, which seems indefensible and deserving of the strongest condemnation. No confidence can be placed by this department in any official who would be guilty of this sort of thing, nor does he seem worthy of the confidence of the directors of the institution. He should be required to resign and cease his connection with the company. The examiner states ·that the matter is known only to yourself and Directors Foster and Munroe, and that at the interview he had with you and Director Munroe, at your home, on the evening of March 18th, the matter was thoroughly gone over and that he informed you and Director Munroe that the facts must be made known to every director, which, I assume, has been done.'

"On receipt of this letter, which it is admitted, contains an accurate statement of the transactions therein referred to, the directors, on June 21st, 1909, held a special meeting. Smith tendered his resignation and a vote was had on its acceptance. Three ballots were taken. On the first two there were two votes cast in favor of acceptance, one of them by Mr. Odell, the president, the thirteen against it. On the third ballot the vote was unanimously against acceptance and Smith continued to be treasurer until the close of the institution.

"In accordance with the commissioner's request, Mr. Odell forwarded to him a copy of the minutes signed by all the directors except Mr. Munroe, who was abroad. The commissioner acknowledged its receipt and said it would have his consideration. He added: 'I will say now, however, that I emphatically disapprove of the decision of the board in the matter.'

"The question to be determined is whether the acts set forth in the letter were merely irregular or whether they showed Smith to be untrustworthy. Section 15 of the by-laws provides that the treasurer

'shall sign all checks, drafts, notes and orders for the payment of money and pay out or dispose of the same under the direction of the president or board of directors, taking proper vouchers for such disbursements and shall render to the president and directors at the regular monthly meetings of the board or whenever they may require it an account of all his *transactions as treasurer.'*

"Section 17 provides that the executive committee shall superintend and advise all investments to be made with the funds of the company. The executive committee may, in its discretion, authorize the *president* to make investments without previously consulting the committee.

"Now, the commissioner's letter shows that on February 6th, 1909—that is, two months and six days after the bank had begun business—Smith lent $1,350 to his friend Nones. He did not note the transaction on the stub; did not enter it in the books, and did not credit it to the bank on which the draft was drawn until he had made the amount good by a draft on the Philadelphia bank one week later, which also remained uncredited. 'The reason for transferring this shortage to the Philadelphia National Bank,' says the bank commissioner,

'is apparent when it is stated that the compàny has no regular draft book on that bank [it has such a book in the case of its other correspondents], only ordinary bank drafts being used for the purpose of drawing on Philadelphia, the stubs not being filled in, hence there were no telltale stubs to show those two transactions.'

"It thus appears that without consulting Mr. Odell, who called at the bank daily, he first lent $1,350 contrary to the by-laws,

and then, this not being paid, $1,000 more, and kept the shortage off the books until the examiner came on March 12th. Then, fearing discovery, he confessed the matter.

"But this was not all. The commissioner in his letter says:

"'This led to the discovery that the above transactions with Nones were not the first of the kind, but that similar transactions had occurred in December and January, and that where such transactions had been made the stubs of the check books were blank, having neither name, account or date.'

"Now, it seems to me, that to call such transactions mere irregularities is impossible. Had Smith forgotten to enter a single draft on his books after having been authorized by the president or executive committee to make it, that would have been an irregularity, but he lent without authority; concealed what he lent, and falsified the accounts until discovery was imminent. He did this several times within a few weeks after the company commenced business.

"It is, moreover, admitted that when the bank examiner communicated to Mr. Odell and to Mr. Munroe what he had learned, he told them of rumors as to Smith's record. Mr. Munroe testifies that he investigated it, but he does not tell us how or what he learned, if anything. He says that whatever Appleton told him he reported to the board. When the board met on June 18th, 1909, the minutes state that the directors thoroughly discussed the commissioner's letter, but they say nothing about any investigation of the rumors. In view of the fact that Smith's conduct had been so reprehensible from the start, it is quite surprising that it was not thought advisable to follow up the rumors in order to find out what, if anything, Smith had done to give rise to them. The information came from a man in daily contact with bankers.

"The argument advanced on behalf of the board is that it was composed of business men of excellent reputation, and perfectly honest in all that they did; that they were unwilling, without necessity, to cast a shadow upon their undertaking at its start; that, to quote counsel's argument, 'the transaction was an isolated one—not involving moral turpitude; that it must have ap-

peared to them more like an irregularity in banking matters than an absolute wrong, and that for judgment honestly exercised no action will lie.' It is, undoubtedly, true that the directors who so acted were, with one exception, men of business experience and perfectly honest. But this would not exonerate them, if they with the best intentions knowingly retained a dishonest man. The institution was small. Its whole working force consisted of Smith, himself, a teller, a bookkeeper, a stenographer and a janitor, all subject to Smith's direction. If the directors were going to entrust the money to the depositors [over three thousand in number, in 1913] to the keeping of one man, that man should, certainly, have been above suspicion. Now, what did the directors know? They knew that Smith had lent money in disregard of the by-laws; that he had failed to advise with Mr. Odell, whom he saw daily; that he had failed to make the proper entries, not from forgetfulness or carelessness, but because he intended to conceal what he had done; they knew [for they were so informed by the examination and the commissioner's letter] that he had done it more than once, and they knew, too, that in doing so, he had, necessarily, either falsified the general ledger or caused it to be falsified. The falsification of books or the making of a false statement of facts is a 'high misdemeanor' under section 17 of the Trust Companies act. Under these circumstances had they given the matter real consideration, it seems to me that they would have come to no other conclusion than they had in their employ a man who was willing to deceive them. The general ledger which he had control of, and in which the account of the depository banks was kept, showed each day for more than a month the aggregate balance standing to the company's credit to be $2,500 more than it really was. The minutes of the executive committee show that the total deposits were reported by him weekly.

"Now, the cases hold that directors are guilty of a plain breach of duty if they retain in responsible position a man who has shown himself to be unworthy of trust. *Scott* v. *National Bank,* 72 Pa. St. 471; *Third National Bank* v. *Boyd,* 44 Md. 247; *Cutting* v. *Marlor,* 73 N. Y. 454; *Prather* v. *Kean,* 29 Fed. Rep. 498; 137 U. S. 604; *Gibbons* v. *Anderson,* 80 Fed. Rep. 345;

*Rankin* v. *Cooper, 149 Fed. Rep. 1010; Williams* v. *Brady, 221 Fed. Rep. 118.* If Smith had deceived them once, what sufficient reason had they to suppose that he would not do so again. They not only retained him, but they did so against the warning of the commissioner of banking, who was vested by the statute with power of supervision (*Comp. Stat. p. 5662 § 21*), though not of removal. Says Mr. Justice McKenna, speaking of the federal comptroller in *Thomas* v. *Taylor, 224 U. S. 73:* 'Disregard of the direction of the officers appointed by the law to examine the affairs of the bank is a violation of the law. Their directions must be observed. Their function and authority cannot be preserved otherwise and be exercised to save the bank from disaster and the public who deals with them and supports them from deception.'

"It cannot be overlooked that the directors were without banking experience. New to the business, it was all the more incumbent upon them to heed the advice of the officer to whom the law had committed the duty of supervision. I am unable, therefore, to agree with the argument of counsel that the vote of fifteen good business men to retain Smith is the best evidence of what it was reasonably prudent and expedient to do under the circumstances. To hold that a mere vote is the best evidence of prudent action is practically to hold that, given an honest board whose members possess a fair amount of intelligence the court is precluded from deciding otherwise. This is not the language of the cases. The directors may condone mere irregularities, but they cannot condone moral obliquity without rendering themselves liable for the consequences.

"Smith's conduct proved that he was capable of deception. One would have supposed, therefore, that if he was to be retained some check would have been imposed upon his action. Counsel argue that any action taken to that end would have shown lack of confidence and would have condemned their vote. This shows the difficulty of their position. In *Campbell* v. *Watson, 17 Dick. 427*, Pitney, V. C., quotes with approval the following passage from *Percy* v. *Millaudon, 8 Mar. (N. S.) 68:* 'The duties of directors are those of control, and the neglect which would render them responsible for not exercising that control properly, must

depend on circumstances, and, in a great measure, be tested by the facts of the case. If nothing has come to their knowledge to awaken suspicion of the fidelity of the president and cashier, ordinary attention to the affairs of the institution is sufficient. If they become acquainted with any fact calculated to put prudent men on their guard, a degree of care commensurate with the evil to be avoided is required, and a want of that care certainly makes them responsible.' In the present case, assuming it to have been due care, in the first instance, to have given the treasurer unlimited opportunity to draw upon all the funds of the institution, certainly, when it was found that, from the very beginning, he had abused his power, ordinary prudence would have suggested that restraints be placed upon his action. None were even the subject of consideration. The evidence shows that, as time went on, Smith was allowed a greater degree of control. At first Thompson kept the general ledger. After a time Smith was allowed to keep it, and, by keeping it, to acquire greater facilities for deception.

"I think it impossible to avoid the conclusion that by retaining Smith and allowing him, without check or restraint, to dispose of the moneys of the institution, the directors made themselves responsible for the consequences of his acts.

"The act concerning trust companies (*Comp. Stat. p. 5654 § 12*) provides that

'each director of every trust company when elected shall take an oath that he will, so far as the duty devolves upon him, diligently and honestly administer the affairs of such trust company, and will not knowingly violate or knowingly permit to be violated any of the provisions of this act.'

"It is contended that the directors and two of their committees —the executive and the examining committees—failed diligently to administer the company's affairs. I will first take up the executive committee.

"The by-laws provide (section 17) that the executive committee 'shall superintend and advise all investments, but may, in its discretion, authorize the *president* to make investments without previously consulting it.' This by-law was disregarded from the beginning. The executive committee authorized some of the

loans, but most of them were made, not by it or the president, but by Smith. On November 30th, 1908, the minutes of this committee state that it was moved 'that the treasurer be empowered to make loans up to $1,000 without consultation.' He not only did this, but, as early as June, 1909, he began, without any formal authorization, to make larger loans. We find in the minutes of June 29th, 1909, for instance, a statement that the loans of the week were approved, and among them one of $1,100 and one of $2,500. After they were made they were submitted to the executive committee at their monthly meeting and approved, the approval being noted thus, 'Bills purchased during the week were approved.' The money was so recklessly lent that an enormous loss resulted. Mr. Vredenburgh, the state examiner, found that the face value of the notes and loans [$623,585.65] when the company closed its doors was $181,603.94 greater than their fair value. Had the executive committee passed upon these loans, in the first instance, such a loss would hardly have been possible. Its collective judgment, based upon personal knowledge and proper inquiry, would have been quite a different thing from its perfunctory approval of what Smith had already done.

"Not only was there a failure to comply with the by-laws. The statute was disregarded as well. The Trust Company act (section 6) authorizes the trust company (*inter alia*) 'to purchase, invest in and sell stocks, promissory notes, bills of exchange, bonds and mortgages and other securities.' In section 7 it provides that

'no corporation created under this act shall have power to discount commercial paper or *to make loans upon bills, notes or other evidences of debt* [except to a municipality], unless the same shall be secured by mortgage upon lands or by other securities, the actual market value of which other securities shall at all times exceed by at least ten per centum the amount loaned upon the same.'

"The evidence shows that the company made it their principal business to discount or lend money upon paper. Some of this had only one name, but the greater part of it was endorsed. By the statute, whether endorsed or not, it all stood upon the same footing. In *Durant* v. *Banta, 3 Dutch. 624,* the case relied upon by defendants, it was said that 'to lend money on the security of

a note is one thing; to sell a note is another.' There the court was considering whether a note *on which the payee had acquired a legal right to sue the maker* could be endorsed by him *generally* and then sold without rendering the transaction usurious; and, reversing the prior decision in *Freeman* ads. *Britton,* the court of errors and appeals held that such a transaction might, as between payee and purchaser, be a loan or a sale according to the real meaning and intention of the parties, and that this was to be determined by the evidence. The distinction is between paper on which the payee had acquired a legal right to sue—paper which, by the express terms of the Trust Companies act, the company has the right to buy, and paper on which no right to sue arises until the company has acquired it, their right to sue arising, and arising only, out of the fact that they have lent money upon it. Having lent money in disregard of the statute and by-laws the directors as a body are responsible for any resulting loss, for they knew and approved of the action of their committee in this regard. *Citizens Loan Association* v. *Lyon* 2 *Stew.* 110; *Williams* v. *McKay,* 13 *Stew.* 189.

"I now come to the examining committee. Section 14 of the Trust Companies act provides that

'the board of trustees of each trust company shall from time to time appoint from its members an examining committee whose duties shall be to examine the condition of the company at least once every six months or oftener, if required by the board; and such committee shall after each examination forthwith report to the board, giving in detail all items included in the assets of the trust company, which they have reason to believe are not of the value at which they appear on the books and records of the company, and giving the value in their judgment of each of such items, and the board shall cause said report to be recorded in the minute books of the company.'

"The statutory duty imposed upon them by their oath and by this section of the act was to examine diligently and honestly. The committee by accepting the task undertook to use as much diligence and care as the proper performance of their duty required. *Campbell* v. *Watson, 17 Dick. 442.* If its members were not already sufficiently familiar with the books to make an intelligent examination of them, it was their duty to become so. Not an examination such as an expert accountant would have made,

but an ascertainment of the assets and liabilities, as far as ascertainable by careful work, such as they were able to do. The assets consisted chiefly (1) of cash in the vaults of the company; (2) of the negotiable paper, misnamed on the books 'bills purchased'; (3) of collateral and other loans, and (4) of amounts that were due to the bank from other depository banks. The first three were tangible and could be counted and examined. The amount due from other banks could be ascertained by inquiry of those banks. As to assets, such as these, the object of the examination was to ascertain, first, whether they corresponded in amount with the statement of them on the books, and second, whether the individual items had the value attributed to them.

"Pitney, V. C., himself an experienced banker, in *Campbell v. Watson, supra, 416,* said: 'In making the examination it is necessary to ascertain the amount of each item without the aid of the ledger with which they are to be compared and independent of the books. To rely upon the books alone for that purpose is simply absurd. The cash and bills discounted and other tangible assets must each be seen, handled, inspected and counted, and the amount due from other banks must be ascertained in some manner equally efficient.' The items must not only be handled and counted, they must, under the Trust Companies act, be valued. Section 14 makes it the duty of the examining committee to report to the board giving in detail all items included in the assets which they have reason to believe are not of the value at which they appear on the books and giving the value in their judgment of each of such items. Unless the examination of the assets embraces all this it is not 'diligent.'

"As to the liabilities, the case is somewhat different. Here the books must be taken as they stand. There is nothing wherewith to compare them. They may be compared with each other, but the result of the most careful examination is not conclusive. The case in hand is an illustration. The evidence is, that the treasurer, who not infrequently took the place of the teller, altered the deposit slips and credited the customer with less than he had handed in over the counter. Here, it is obvious, the books would fail to indicate the true amount standing to the

depositor's credit. Then, again, the treasurer repeatedly cashed checks, whose drawers had nothing or very little to their credit, and either made no note or a false note of the payment; keeping the checks in a receptacle to which no one but himself had access. The committee had no means of ascertaining what checks had been cashed except as the books showed, and no way of ascertaining the amount really due the depositor unless it communicated with him or called in his pass-book. It may be doubted whether, in the absence of anything calculated to excite suspicion, this duty was imposed upon it. Mr. Cloran, the expert employed by complainant, says that the calling in of pass-books might have caused a run upon the company. The fault, in this particular, if fault it was, was rather one of system. One way of meeting the difficulty is that now adopted by many well-conducted banks and trust companies. They send to their customers at stated intervals an account of their balances.

"In the case under consideration the committee handled and counted the assets, but did not report 'the value of such, as they had reason to believe were not of the value at which they appeared on the books.' This was not so in the case of the Scarlett note for $10,000, the Miele and Bruno notes of $27,000, the Frederici notes of $1,235, and other notes mentioned in the banking commissioner's letter of October 28th, 1912. The duty to report these notes, on which there were heavy losses, was, as I have shown, a statutory one, and, inasmuch as the report was to be made to the entire board and entered on its minutes, not only the committee but the board, as a whole, was negligent in not requiring performance.

"The examining committee was also negligent in its examination of the accounts of depository banks. Of these there were several, two in Newark, one in Albany, one in New York City and one in Philadelphia, and they often held large balances to the credit of the trust company. These credits were a part of the assets, and often a large part. The trust company's general ledger stated the amount. Smith made the entries, and it was the committee's duty to see that the entries were correct. To this end the chairman of the committee was in the habit of writing to the correspondent banks to find out what their balances

were as of the day of the examination. Now, it is evident that the balances given by the correspondent banks as of that day might not correspond with the balance appearing in the trust company's ledger under the same date; for checks in transit would cause a difference. These checks might be of two kinds. (1) Checks drawn by the cashier of the trust company upon the correspondent banks. These would diminish the apparent balances in the correspondent banks. (2) Checks or drafts held by the Roseville bank and sent for deposit to the correspondent banks. These would, when they reached their destination, increase the balances standing to the credit of the trust company.

"The committee were negligent in this. They took Smith's statement as to what these two classes of checks or drafts were, instead of getting a statement of them from the correspondent banks, as they could have done by obtaining a statement not only of the balance on the given day but of the checks and drafts that might have come in three or four days afterward. To rely upon Smith's statements—the statements, written and verbal, of the man whose work they were verifying—was, to use the words of Pitney, V. C., in the case cited, speaking with reference to a precisely similar situation, *absurd*.

"Now, Smith, who was always present while the examination was going on, soon found out in what respect the committee's inquiry was defective. To cover up his abstractions, or some of them, he entered a balance in the general ledger such as would for the time being serve to conceal them, and he then explained to the committee that the balance thus entered differed from the balance reported by the correspondent banks because of the checks in transit. It was here that the committee's examination failed. It did not verify his statement of checks in transit.

"It is next contended that the examining committee were negligent in not examining the paying teller's proof-books. It is said that if they had done so they would have discovered an abnormal amount of cash items, so called, and that their discovery would have led to the discovery of Smith's other methods.

"Cash items, or, as it is styled in the proof-books, cash itemized, is a technical term and means in banking phraseology, as I understand, notes, checks or memoranda in the paying-teller's

possession at the close of the day's work, that he, for the time being, treats as cash. They may be items cashed after banking hours or they may be items held for criticism or inquiry. They are of such importance that they are specially mentioned on the printed blank reports furnished by the banking commissioner under the head, 'Checks and other cash items.' They do not include the checks or bank bills deposited by customers in the ordinary course of business.

"In the general ledger kept by Smith, both cash, properly so called, and cash items were entered as cash. During the last year of the company's existence the cash items often exceeded $40,000. To anyone casually consulting the general ledger—the book which gave a résumé of each day's work—the showing of cash on hand would therefore be misleading—in the case at hand, not only misleading, but false—for the cash items consisted very largely of worthless paper—paper which Smith had cashed, but not entered on the books, and which had therefore, for the time being, to be treated as cash by the teller in order to make his proof-book balance. When the committee was expected—and Smith was usually informed in advance of its coming—he took these cash items, or such of them as were illegitimate, out of the cash, and then—by false entries covered up the abstractions. One way of doing it was the way already referred to—a pretended remittance to a depository bank. When the committee counted the cash, the cash items had disappeared. They did not show on the teller's proof-book for that day because removed before it was balanced. But the committee did not examine the proof-book; they compared their count of the money with the cash entry made by Smith in the general ledger after their arrival and found it correct. It is claimed that their failure to look at the proof-books was negligence. Whether it was or not depends on how far the committee should have gone in the examination of the books. It will be more convenient to discuss this in connection with what follows.

"The examining committee are further charged with negligence in not detecting Smith's manipulation of the general ledger. Perhaps, the most glaring instance of this occurred in the course of the examination of December 14th, 1912. As al-

*93 N. J. Eq.*                    LaMonte *v.* Mott.

ready said, the general ledger showed a trial balance for each day's work. It gave the total of the different kinds of assets and of the different kinds of liabilities in separate columns so arranged as to balance. The committee verified the figures by comparing them with the assets as actually counted and with the liabilities as they were stated in books of original entry. At the time when the December examination began, the collateral loans were truly stated at $51,438, but before the committee had completed the addition of the column which contained the various assets, Smith put the figure 'one' before the other figures, thus making the collateral loans appear to amount to $151,438. This covered up a deficit of $100,000 and made the debit and credit columns balance. The act was a bold one, for had the committeeman who performed the addition happened to observe the figures and their connection with the words 'collateral loans,' it would at once have occurred to him that the collateral loans were overstated and this would have led to the discovery of the trick. The contention is, that the committee's failure to observe this alteration, and their failure in the case of the other examinations to notice erasures made with similar intent, was gross negligence. Judging by the result, it would have been better to have taken the books into their exclusive custody while the examination was going on, or, as counsel suggests, to have used their own figures in computing the totals, comparing them, after the computation, with the figures in the ledger. But I doubt very much whether they could be called over-confiding when they assumed that Smith would not be guilty of the crime of altering the books in the short space of time that it took to make the examination. It was suggested that they ought to have compared the figures in the trial balance of December 14th with the figures in the balances of previous days. This, too, as in the case of their failure to observe the cash items in the proof-books, brings up the question as to how far they should have proceeded in the examination of the books generally. The task of the committee, as they understood it, was to ascertain the assets and liabilities at the time of the examination. To have examined the figures in all the books for the whole, or even a part of the preceding six months, would have been the work of an expert accountant,

and, if not an impossible undertaking for the committee, would have occupied more of its time than any examining committee could reasonably have been called upon to give. It is difficult for one without knowledge of practical banking to say how far such a committee in a well-conducted institution ought to go. There is no evidence on the subject and perhaps none of any value could be obtained. It is to be noted that this case differs from most of the reported cases to which my attention has been directed. In the *Watson Case,* for example, there was no attempt at supervision or examination. Here, there was an honest effort on the part of the committees to do their duty. The executive committee met weekly. The examining committee met semi-annually and made an examination that seemed to it to be sufficient. They could hardly have anticipated that Smith would manipulate the cash items and alter books in their very presence and while the examination was going on. At all events, I find difficulty in convicting them of culpable negligence when they assumed that he would not. The observation of Pitney, V. C., in *Campbell* v. *Watson,* seems to apply. He says: 'No one, I suppose, will go so far as to suppose that any system of supervision practicable at this day will absolutely prevent a dishonest cashier who has charge of the cash of the bank from stealing some of it and stealing it in such a manner that not a shadow of ground would exist for holding the directors liable for the loss.'

"It would answer no useful purpose to discuss in detail the alleged neglect of the committee to examine the other books and compare them with the general ledger. The observations above made apply to their acts in this respect as well, and whether their examination should have extended to them or not, their liability and that of the directors, as I have found it, would remain unchanged.

"Thus far I have discussed this case as it bears upon the liability of those of the directors who were such from the beginning. One of the directors, Mr. Dunn, was elected to the board in January, 1912, and again in 1913. He was an architect and real estate agent. On the day of his election he was made a member of the examining committee. The examination of April, 1912, was the only one that he took part in. The work was divided up

among the different members. To Dunn was assigned the task of examining the so-called 'bills purchased' in amounts varying from five dollars to five thousand, and aggregating at that time about five hundred thousand dollars. These he examined and checked up with a typewritten list furnished by Mr. Sexton, the chairman. Then he examined a bundle of mortgages and found that they were regular in point of form and accompanied with proper policies of insurance. A few days after he went to the Fidelity Trust Company's vault, and, with other members of the committee, counted the collateral loans. He heard Mr. Sexton read letters received from the depository banks, whose figures tallied with those they had. This completed his part of the work. He did not examine the general ledger or the other books. He was young and inexperienced, and he was trying for the first time to do the work assigned to him by the chairman, Mr. Sexton. In so far as I have been unable to convict the other and more experienced members of the committee of negligence, I cannot convict Mr. Dunn. And I do not think that he, as a member of the committee, could at that time, inexperienced as he was, be charged constructively with the negligence of Mr. Sexton, who had not required from the correspondent banks such a statement as has been mentioned. Besides, it does not satisfactorily appear that at that time [April, 1912] Smith was using the correspondent bank accounts to cover up his frauds. There were discrepancies [$826.74 in the case of the Union bank and $597.09 in the case of the Irving bank], but I am unable, on Mr. Cloran's evidence alone, to conclude that, while small in amount, they were part of an effort to deceive. They might have been susceptible of explanation on grounds consistent with honesty. At that early stage of his abstractions Smith had better and safer ways of covering them up.

"Two other examinations were made before the company failed, but Dunn did not take part in them. Sickness prevented him from attending one and a wedding trip the other.

"It is insisted that Mr. Dunn is liable because as a member of the examining committee he with the others failed to perform his statutory duty to report to the board such assets as in the opinion of the committee ought to have been carried at less than

their face value. That there were such assets and that they did not report them is indisputable. That any loss resulted directly from the failure to report is not proven. The entire board knew that the Scarlett and some other loans ought not to have been carried on the books at their face value, and if the examining committee had reported the fact, and the report had been entered in the minutes, the board would not have been informed of anything they did not know before. The failure to comply with the statute is evidence of negligent conduct on the part of the committee and of the board, but does not necessarily increase their liability.

"The evidence shows that after Mr. Dunn became a director loans were made when the reserves were depleted and dividends were declared when there was no surplus. It does not show that the directors knew this. The argument is, that examination would have shown it. But here, as before, we are met with the fact that there was, on the part of the directors and committeemen, an honest effort to perform their duties. The examining committee, as has been said, met half-yearly and made what they regarded as a sufficient examination. The executive committee met once a week and the directors once a month. There was no such 'supine neglect' as appeared in *Campbell* v. *Watson, supra.* When they lent money and declared dividends, they had before them Smith's weekly statements, their own examinations, the examination of the state bank examiners, and their general knowledge of the course of business, and they relied upon them as the basis of their action. I do not think that, under the cases, there was a lack of ordinary care on their part because they went no farther.

"Mr. Dunn is liable for loans made contrary to the by-laws and the statute, after he became a director, if any loss resulted therefrom, for the reasons heretofore mentioned.

"I do not think it necessary to consider how far the president was in fault in signing the reports prepared by Smith and made to the banking commissioner without examination as to their correctness. He has been released. The attesting witnesses have been held on other grounds. At farthest the evidence does

no more than show an additional instance of lack of diligence on the part of the president.

"The insistence of the defendants is that they have all been released by the legal operation and effect of the releases given to some of their number. On the application to strike out the bill (*LaMonte* v. *Lurich, 86 N. J. Eq.* 26) the same defence was set up, but on an allegation that did not fully and fairly state the facts. It would, indeed, have been unfortunate for the parties concerned if, after this prolonged, complicated and costly litigation, it should have turned out that these releases had the effect now contended for. The real question ought to have been determined in advance, and to that end the pleader ought to have set forth the facts as they are. The allegation passed upon was this: That Odell and others made partial restitution * * * 'pursuant to an agreement duly made with said directors on December 10th, 1913, and pursuant to the express provisions of the statute, but without prejudice to the causes of action against the other directors as herein alleged.' The decision was that the alleged agreement was a covenant not to sue and not a technical release. It now appears that a technical release was in fact given by the commissioner of banking, and the insistence made on his behalf is that other contemporaneous documents so qualify the effect of the release as to make it operative only on those to whom it was given. The facts are as follows:

"On December 10th, 1913, the commissioner of banking entered into a written agreement with the Mutual Bank of Roseville, a corporation that had been organized to take over the property of the insolvent company, wherein it was agreed that, '*subject to the approval of the court of chancery,*' compromises would be made with nine of the directors, the proceeds of which were to be included among the assets to be sold to the new bank, but that there was excluded from the sale 'any right to recover from officers and directors of said Roseville Trust Company on account of the negligence or improper conduct of said officers and directors exclusive of' those with whom the settlements were to be made. The agreement also provided that the commissioner would institute suits against those not settled with to recover for losses suffered by their negligence.

"An application was then made to the court of chancery upon notice [*inter alia*] to all the directors to obtain its approval of the agreement, pursuant to the provisions of section 22 of the act concerning trust companies. *P. L. 1913 p. 283.* The provision reads as follows:

" 'For the purpose of executing and performing any of the powers and duties hereby conferred upon him, the commissioner may, in the name of such trust company, prosecute and defend any and all suits and other legal proceedings, and may, in the name of such trust company, execute, acknowledge and deliver any and all deeds, assignments, releases and other instruments necessary to effectuate any sale of real and personal property or sale or compromise or compound, authorized by the court of chancery as herein provided.'

"After a hearing the court of chancery authorized the commissioner 'to complete and carry out the compromise and settlements upon the terms and conditions *set forth in the said contract.*' The commissioner thereupon gave to each director who settled with him a release which, as far as the present question is concerned, was, in terms, absolute. It does not refer to the above-mentioned agreement and it cannot, on the face of it, be construed as a covenant not to sue. The question, then, is, Can it be regarded as such a covenant if taken in connection with the other contemporaneous documents? Perhaps a better way of putting the question would be this: · Considering the petition, the order and the agreement, ought not the operation of the release to be restricted to the releasee, who alone is named therein? This question, at least, in equity, seems almost to answer itself. If the construction contended for by the defendants should be adopted, the banking commissioner would be convicted of having deliberately disregarded the order of this court. It was a part of the scheme, and so represented to the court, that the other directors not settled with should be sued for their negligent acts. The commissioner had no authority to release them. By holding that he has not in fact released them no violence is done to the language of the release. It has full effect, as far as its language goes, for it does not, in terms, purport to extend to or give immunity to anyone but the releasee. If it extends to others, it is not because it so states but by legal construction. The other

documents rebut the wider effect ordinarily given to such a paper and show that its operation is to be limited to the releasee only. I know of no rule of law which will prevent the expressed intent of the parties from being carried out. Contemporaneous documents are frequently read together and construed as one harmonious whole. If the order, contract and releases be so read it is apparent that the scheme was that the releases were to effect the releasees only. Such being the case, there is no reason why this court should now say that the defendants are entitled to an immunity that the court did not intend and that the commissioner had no right to give. The case of *Murphy* v. *Penniman, 66 All. Rep. 282,* is very much in point.

"The briefs discuss at length the question of degrees of responsibility as it was formulated in *Williams* v. *McKay, 46 N. J. Eq. 25.* The contention on the part of the defendants Benjamin and others is that the president and committeemen were more negligent than they were and stood in a higher grade of liability. The corollary drawn is, that if the president and committeemen were released, the others were, to the extent of their prior liability. In the view that I have taken of the case, the question does not arise. All the directors stood in the same degree of negligence when they retained Smith and when they lent money contrary to the statute and by-laws."

MINTURN, J. (dissenting as to Dunn).

If the case presented by these appellants were predicated only upon the theory that they had pursued a course of conduct as directors in the management of the affairs of the Roseville Trust Company, which during a period of years was known to the banking department, and was neither criticised nor objected to, but was allowed to continue unchallenged as to its business correctness and legality, I should hesitate, under the acknowledged rules of law imposing liability upon defendants as trustees, to sustain this decree. It might well be contended that such a course of tacit acquiescence upon the part of the banking department had given to the Trust Company act regarding the making of loans by way of purchase of commercial paper as distinct from the usual method of discounting peculiar to the law merchant a

practical working construction, and thus had impressed upon the practice a semblance of legality, which would relieve these appellants of anything more than a technical charge of tort-feasance or wrong-doing by adopting it as a banking method. A practical construction of that character was given to the act under which the secretary of state had appropriated fees to his own use upon a claim of ownership thereof, based upon continuous usage by his predecessors, unchallenged by the state financial officers for many years. *State* v. *Kelsey, 44 N. J. Law 1.*

A usage of that general character long acquiesced in by the department of state has protected the plainly limited and restricted legislation under which riparian grants were originally made from successful attack in ejectment. *Hoboken* v. *Pennsylvania Railroad Co., 124 U. S. 656.*

Superadded to this construction the rule is generally accepted that for an honest error of judgment the trustee cannot be held personally liable. *Citizens Association* v. *Coriell, 34 N. J. Eq. 392.*

To hold otherwise would be to erect a practical barrier to the acceptance of a position of trust of this nature, by any one short of a person capable of devoting his entire time to the business, plus the possession of necessary expert or technical knowledge of the business, which common experience teaches, few directors can bestow or can claim to possess. *Hensler* v. *Sharp 45 N. J. Eq. 367.*

The result is that the liability of a trustee in such a situation, except when the loss results from obvious indifference amounting to negligence or recklessness, must always be determined practically by the *quo animo*. *Williams* v. *McKay, 40 N. J. Eq. 189; 10 Cyc. 830,* and cases.

These considerations would be controlling as to all the appellants were it not that the testimony shows that on more than one occasion their attention (with the exception of Dunn) was called to the derelictions of the Cashier Smith, and to his devious financial methods, and that with their eyes open to the dangers inherent in the situation, and against the practical protest of the banking department, they retained him with the usual resulting

financial debacle. In such circumstances the elementary rules of liability must be invoked, that he who reposed the confidence which caused the loss must bear it as against an innocent third party, and as to these appellants, excepting Dunn, liability may be predicated upon that ground. *Manchester Building and Loan Association* v. *Geyer 71 N. J. Eq. 192; 10 R. C. L. 695; 21 C. J. 1170.*

As to Dunn a different question arises. He entered the directorate after the questionable transactions with Smith had practically culminated, and no notice of those transactions or of the bank department's action was accorded to him, so far as the proof shows. He appears not to have been derelict in his duties during his directorship or indifferent to his responsibilities, and the past affairs of the bank, so far as the testimony shows, were to him a closed book. He is therefore not in the same category with the other directors, and for that reason the rule of liability invoked against and legally applicable to them can have no application to him.

The rationale is clearly and succinctly presented by Chancellor Runyon in *Ackerman* v. *Halsey, 37 N. J. Eq. 365,* and followed and applied by Vice-Chancellor Garrison in *Barry* v. *Moeller, 68 N. J. Eq. 489,* as follows: "Each director will answer only for the period of his administration, and, in making its decrees, the court will of course discriminate between those who are culpable and those who are not."

These considerations lead me to affirm the decree under review as to all the defendants excepting Dunn. As to him the decree should be reversed.

Mr. Justice Parker and Judges Heppenheimer and Gardner request me to state that they concur in these views.

GARDNER, J.

In the above case I vote to affirm only that part of the decree that finds the directors, exclusive of Dunn, "liable for the specific sums and parcels of the $575,000, approximate losses due to misappropriation and misapplication of the funds and property by the treasurer, Raymond E. Smith."

*Messrs. Collins & Corbin,* for the complainant.

*Mr. Roger Hinds,* for the defendants.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Stevens.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, BERGEN, KALISCH, BLACK, KATZENBACH, WILLIAMS—8.

*For reversal*—PARKER, MINTURN, HEPPENHEIMER, GARDNER—4.