HUBBARD et al. v. MANHATTAN TRUST CO.

(Circuit Court of Appeals, Second Circuit. April 7, 1898.)

No. 73.

1. EQUITY PLEADING—PARTIES.
The joinder of a party who has no interest in the suit may be taken advantage of by general demurrer for want of equity; but the defect is curable by amendment.

2. SAME—PLEDGE.
The pledgee of a chose in action, having an equitable interest therein, is a proper party plaintiff in a bill in equity with reference to such chose in action.

8. SAME.
Where an assignment of a chose in action is not absolute, or its extent or validity are in dispute, or remaining rights or liabilities of the assignor may be affected by the decree in a bill in equity with reference to such chose in action, the assignor is a necessary party to such suit. His nonjoinder, however, may be cured by amendment.

4. SAME—CASE FOR RELIEF—DEMURRER.
Where a subscription certificate for railway bonds on its face entitles the subscriber merely to bonds of some one of several railways, whenever such bonds may be issued, but the subscriber's bill of complaint alleges that a supplementary agreement was made by which he was to receive bonds of one specified company, and that all the bonds of that company have been otherwise disposed of, the bill states a case for relief, and is good on demurrer.

5. SAME—RECENTLY DISCOVERED FRAUD—NECESSARY AVERMENTS.
In a bill for relief from an alleged, but recently discovered, fraud, there must be distinct averments as to the time of discovery of the fraud, how the knowledge was obtained, why it was not obtained earlier. and as to diligence previously used in investigating the transaction. A mere allegation of concealment and ignorance is not sufficient.

6. SAME—STALENESS OF CLAIM—DEFENSE HOW RAISED.
A defense grounded upon the staleness of the claim asserted may be made by demurrer.

7. SAME—DEMURRER—AMENDMENT TO BILL.
Where a bill has been dismissed on demurrer for laches, because no sufficient explanation of the delay is pleaded, the appellate court may, in the absence of positive inequity, reverse the decree and direct the allowance of an amendment to the bill.

8. STOCK CERTIFICATE—ASSIGNMENT.
Although stock certificates provide that they shall not be negotiable without the consent of the company and transfer on its books, a complete equitable title passes by absolute and unconditional assignment.

9. LACHES—WHAT CONSTITUTES.
The defense of laches is not a mere matter of time, like limitation, but is a question of the inequity of enforcing the claim; and hence the statute of limitations does not necessarily bind the court in all cases. Each case depends upon its own circumstances, and no invariable rule as to time and vigilance can be laid down.

Appeal from the Circuit Court of the United States for the Southern District of New York.

Chas. H. Hanson, for appellants.

John L. Cadwalader, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge.    The complainants are Elbert H. Hubbard, as assignee of the Union Loan & Trust Company, an Iowa corporation, John Peirce, and R. J. Chase, each of said persons and their assignors being citizens of Iowa and residents of Sioux City, who are suing in their own behalf and in behalf of all others similarly situated with them who shall come into the suit.    The only defendant served with process is the Manhattan Trust Company, a corporation of New York City.    The circuit court for the Southern district of New York sustained the defendant's demurrer, with leave to the complainants to file an amended bill of complaint within 30 days from the date of entry of the order.    No amended bill having been filed, and 30 days having elapsed, the bill was dismissed, with costs.    It does not appear from the record in what respect the circuit court required amendments to be made.    The grounds of demurrer were:    First, for want of equity; second, that the causes of action are stale, and that so much time has elapsed that a court of equity ought not to take cognizance thereof or to give relief; third, that no case for relief is made by the bill.

The bill makes the following material averments:

Sundry persons, among whom were Francis O. French, the president of the defendant, and Amos T. French, his son, who was its treasurer, caused the Wyoming Pacific Improvement Company to be incorporated in March, 1888, with a nominal capital of $1,500,000, which company was to be the means for the construction of a continuous railway of about 960 miles in length from Covington, Neb., opposite Sioux City, to Salt Lake City or Ogden, and called the "Pacific Short Line."    It was to be built in three sections, by three railway companies, called the "Nebraska & Western Railway," the "Wyoming & Eastern Railway," and the "Salt Lake Valley & Eastern Railway," and the stock of these companies was to be issued to the improvement company.    The only portion of this through line which was actually constructed was a part of the Nebraska road, from Covington to O'Neill, of about 129 miles, which was completed in 1890.    In the latter part of 1888, the improvement company issued a circular for subscriptions in the following form·

"Pacific Short Line.

"The Salt Lake Valley & Eastern, the Wyoming & Eastern, and the Nebraska & Western Railway Companies, respectively, have contracted with the Wyoming Pacific Improvement Company for the construction of their several lines extending from Covington, Nebraska (opposite Sioux City, Iowa), to Salt Lake City, Utah, a distance of about 960 miles.    It is proposed to consolidate these companies in one corporation, to be styled the 'Pacific Short Line.'    The Wyoming Pacific Improvement Company will receive for the road, as constructed, stock and bonds as follows: $20,000 of forty years' five per cent. bonds, and $19,500 of stock for each mile of completed road.    The companies above named will issue for each mile of road: $25,000 of forty years' five per cent. bonds,

and $20,000 of stock. The stocks and bonds issued to and received by the Wyoming Pacific Improvement Company will be exchanged at par for stock and bonds of the Pacific Short-Line Company, when same are issued.

"The Wyoming Pacific Improvement Company invites subscriptions on the following terms: Each subscriber of $10,000 or any multiple thereof, and on payment of the amount to the Manhattan Trust Company, becomes entitled to receive:

| | |
|---|---|
| $5,000 bonds, at 90.......................................... | $ 4,500 |
| Trust receipts for fifty-five shares Wyoming Pacific Improvement Company, at par....... ............................... | 5,500 |
| | $10,000 |

—"In accordance with terms of certificate, copy of which follows:

"No. ———.         Certificate of Subscription.       $———.

"Pacific Short Line.

"This is to certify that ———, having subscribed ——— dollars, will be entitled, on payment thereof to the Manhattan Trust Company, to receive trust certificate for Wyoming Pacific Improvement Company stock for ——— shares (being 55 per cent. of said subscription), and also railway bonds for $——— (being 50 per cent. of said subscription), which shall be delivered within two years from date, or as soon thereafter as the same are issued; subject to option to purchase said bonds at 95 and accrued interest within two years. This certificate is negotiable only by transfer on the books of the company, and with the assent of this company first obtained thereto.

                "Wyoming Pacific Improvement Company,
                       "By ———, Secretary.

"New York, ———, 18—.
"Countersigned and registered by        Manhattan Trust Company,
                       "By ———, President."

The installments were to be paid to the defendant. Annexed to each certificate were blank receipts, to be filled out upon the payment of installments. The residents of Sioux City signed subscriptions of this form to the amount of about $337,500, of which amount A. S. Garretson and John Peirce each subscribed $50,000, John Hornick and James E. Booge each subscribed $25,000, Chase & Taylor subscribed $10,000, and Kearney & Howard subscribed $500. On April 18, 1889, before installments were paid on these subscriptions, the terms were modified so that the money from Sioux City should be deposited in a Sioux City bank, and one-half of the expenditures on the Nebraska road should be paid from that money, and one-half should be paid from the funds in the Manhattan Trust Company from Eastern subscriptions. Thereafter the subscribers hereinbefore mentioned paid their subscriptions in full, except Chase & Taylor, who settled with the improvement company by paying a part of their amount. After these payments, Garretson, Hornick, Booge, and Peirce had in their possession their subscription certificates, all dated April 27, 1889, and installment receipts in full, with the dates of payment of each installment, in the following form, mutatis mutandis:

"This is to certify that A. S. Garretson, of Sioux City, Iowa, having subscribed fifty thousand dollars, will be entitled, on payment thereof to the First National Bank of Sioux City, Iowa, to receive trust certificates for Wyoming Pacific Improvement Company stock for two hundred and seventy-five shares (being 55 per cent. of said subscription), and also railway bonds for $25,000 (being 50 per cent. of such subscription), to be delivered within two years from date, or as soon thereafter as the same are issued. Subject to option to purchase said bonds

at 95 and accrued interest within two years. This certificate is negotiable only by transfer on the books of the company, and with the assent of this company first obtained thereto.     Wyoming Pacific Improvement Company,
     "By E. E. Gedney, Pt.

"New York, April 27, 1889.
"Countersigned and registered by
     "First National Bank of Sioux City, Iowa,
          "By Thos. J. Stone, President."
"The installments on account of the subscription represented by this certificate have been paid as follows:

| Per Cent. | Date. | Amount Paid. | |
|---|---|---|---|
| 25 | May 7, 1889 | $12,500 | First National Bank of Sioux City, by E. H. Stone, Cash. |
| 15 | June 24, 1889 | 7,500 | First National Bank of Sioux City, by E. H. Stone, Cash. |
| 10 | Aug. 10, 1889 | 5,000 | First National Bank of Sioux City, by E. H. Stone, Cash. |
| 10 | Oct. 23, 1889 | 5,000 | First National Bank of Sioux City, by E. H. Stone, Cash. |
| 10 | Oct. 23, 1889 | 5,000 | First National Bank of Sioux City, by E. H. Stone, Cash. |
| 10 | Dec. 13, 1889 | 5,000 | First National Bank of Sioux City, by E. H. Stone, Cash. |
| 10 | Dec. 13, 1889 | 5,000 | First National Bank of Sioux City, by E. H. Stone, Cash. |
| 10 | Dec. 13, 1889 | 5,000 | First National Bank of Sioux City, by E. H. Stone, Cash. |

"At the option of the subscriber, payment may be made in full. In case of default, at option of the Wyoming Pacific Improvement Company, all further rights of the subscriber shall cease to the extent of such default; and, for all cash actually paid, there shall be requited to the subscriber, in lieu of any other interest, the amount paid in bonds at par. Interest adjusted at 6 per cent. from 1st October, 1888."

Hornick's last installment was paid in February, 1890; Booge's last installment was paid in January, 1890; and Peirce's last installment was paid in November, 1890. It will be observed that the certificates which have been thus described, and which were given, entitle the owners to receive "railway bonds," without specifying the class of bonds, and are in accordance with the original circular.

The bill averred that:

"When your orators or their assignors contributed to the construction fund as aforesaid, it was understood and agreed by and between them and the improvement company and the Manhattan Trust Company, to the knowledge of Francis O. French and Amos T. French, that the bonds of the Nebraska and Western Railway Company, when issued, on account of said section of railway from Covington to O'Neill, and the stock of the improvement company, when issued, should, to the amounts specified in the subscription receipts and trust certificates, hereinbefore mentioned, be set apart and reserved in trust for delivery to your orators or their assignors at the times specified in said receipts and certificates respectively; and said Manhattan Trust Company received and held all the stock of the said improvement company and all the bonds of the Nebraska Railway Company with full knowledge of the trust, interest, and first and prior lien thereon in favor of the holders of said certificates for said stock and bonds, including complainants; and with the understanding and agreement on the part of said Manhattan Trust Company, improvement company, Nebraska

Railway Company, and contributors to said construction fund, that said Manhattan Trust Company would receive and hold said bonds and stock in trust to be by it finally delivered to the holders of said certificates or receipts, including those now held by these complainants, under and in discharge and satisfaction of said receipts and certificates and the requirements thereof, and the oral and written agreements relative thereto herein alleged."

To John Peirce was issued, by the improvement company, a certificate that he was entitled to receive on May 1, 1891, or as soon thereafter as the same may be issued, $18,500 first mortgage 5 per cent. gold bonds, of $1,000 each, of the Nebraska & Western Railway Company, due 1929, according to the terms of subscription to said improvement company, with provisions similar to those in the Garretson certificate in regard to purchase and negotiability. He received a similar certificate for $3,000 first mortgage bonds of the Nebraska & Western Railway. These two certificates were countersigned and registered by the defendant on June 28, 1890. Chase & Taylor received from the improvement company a similar certificate for $2,500, of the same bonds, countersigned and registered on September 26, 1890. Peirce also received from the defendant its certificate, registered with the improvement company, June 9, 1890, that he is entitled to receive on October 1, 1893, 203½ shares of the improvement company stock, which are deposited with and stand in the name of the defendant trustee under an agreement of October 12, 1888. He received from the defendant its similar certificate that he was entitled to receive 33 shares of the improvement company stock. Kearney & Howard received a similar certificate registered with the improvement company that they were entitled to 2¾ shares of its stock, which certificate was assigned to Peirce, October 9, 1890, and assented to by the improvement company. Peirce also received from the improvement company a certificate that he was entitled to $40,000 in a total proportion of $675,000, or in that proportion of any less amount earned by the syndicate of the full-paid stock of said company, to be deposited with the defendant, and deliverable after October 1, 1893. The subscriptions under which these Peirce certificates for stock only of the improvement company were issued are not set forth in the bill; but it is alleged that there was an agreement of October 12, 1888, by which all the stock of the company was, when issued, delivered to the defendant in trust for the subscribers, with a voting power upon said stock, until October 1, 1893, reserved to certain of the promoters.

The bill alleges that on August 19, 1896, Chase & Taylor assigned to R. S. Chase all their rights and interests in said certificates; and that on February 15, 1890, "said Garretson, Hornick, and Booge assigned their said certificates to a partnership composed of A. S. Garretson, James E. Booge, John Hornick, D. T. Hedges, and Ed. Haakinson, who in turn at once pledged the same with the Union Loan & Trust Company, assignor of said E. H. Hubbard, as collateral security for an indebtedness greatly in excess of their actual or face value, which indebtedness is due and unpaid, and, as assignee for the benefit of creditors of said Union Loan & Trust Company, said Hubbard has become invested with all the rights of the said trust company in the premises." The bill alleges that in

the year 1890 an agreement was effected between the improvement company and the trust company, through the procurement or aid of F. O. French and Amos T. French, by which certain of the bonds, viz. $2,100,010, issued or agreed to be issued to the improvement company by the Nebraska & Western Railway Company, were hypothecated with the Manhattan Trust Company, to secure loans to the improvement company to the amount of $1,050,000; that subsequently, in the same year, all the stock of the said railway company, and all the bonds issued by said company, to wit, $2,583,000, were, by procurement or with the connivance and aid of the Messrs. French, hypothecated with the trust company to secure a further loan to the improvement company of $600,000; and that, pursuant to the terms of the said agreement, a commission of 5 per cent. was paid to underwriters thereof, who had agreed, if it were necessary, to purchase said bonds at least at 50 cents on the dollar, and a further commission of 2½ per cent. to F. O. French and others for securing the underwriting of the said loan. The bill then alleges that, when said hypothecations were made, F. O. and A. T. French and the Manhattan Trust Company knew that complainants had subscribed to said construction fund, and that subscriptions had been made thereto in Sioux City to the amount of $337,500; and that subscription agreements in the form and in the manner hereinbefore set forth had been made with the orators and their assignors, who had paid the greater part of their said subscriptions, and that, upon payment in full, such subscribers were entitled to receive trust certificates for stock and subscription receipts for bonds, entitling them to stock of the improvement company, and to said first mortgage bonds of the Nebraska & Western Railway Company, in proportion to the amounts of their subscriptions, as specified in their subscription agreements respectively; that the said bonds so hypothecated embraced the entire issue of Nebraska & Western bonds, and all of the bonds which, by the terms of the said mortgage, the said railroad company was authorized to issue; that the said Manhattan Trust Company, with full knowledge of such alleged facts, and that said hypothecations rendered impossible the delivery of said bonds and stock in compliance with said certificates, nevertheless accepted and effectuated said hypothecations; that all said bonds and stock so hypothecated were, during the year 1890, sold pursuant to the terms of said hypothecations, and passed into the possession and ownership of many persons unknown to the complainants; that the facts of such hypothecations were never disclosed to the complainants, but were fraudulently concealed from them by the trust company and F. O. and A. T. French, and were not learned by them until long after they had been hypothecated and sold, as aforesaid; that the bonds and stock comprised all the valuable assets, and that the improvement company became, in the latter part of 1890, hopelessly insolvent, and passed into the hands of receivers, and that neither the stocks nor bonds mentioned or designated in the trust certificates and subscription receipts had been delivered to the complainants or either of them; and the orators or their assignors did not know

nor learn of the frauds and wrongs hereinbefore alleged until after the sale of the stock and bonds so hypothecated as aforesaid.

The complainants thereupon pray that it be decreed (1) that the first mortgage bonds of the Nebraska & Western Railway Company issued on account of the construction of the section of railway from Covington to O'Neill were subject to a lien in behalf of the complainants and the other subscribers to the said construction fund who were contributors thereto, and that such contributors became owners as equitable assignees of said bonds and stock, as the same were issued, to the extent and in the proportion specified in their subscription receipts respectively; (2) that the said agreements be rescinded and canceled, and the defendant account to the complainants for the moneys paid in by them on account of their subscriptions; or if it shall appear that a rescission and cancellation of said agreements cannot be had, or ought not to be decreed, then that the defendant account to the complainants and other contributors for and concerning said bonds and stock so hypothecated and sold as aforesaid, to which the complainants and such other contributors are entitled.

The defendant's first point is that no cause of action is shown in favor of the complainant Hubbard, and that the bill is therefore demurrable generally.　It is true that the addition of a party who has no interest in the suit, and who is not a necessary or proper party on the record, can be taken advantage of by a general demurrer, for want of equity.　Hodge v. Railroad, 1 Dill. 104, Fed. Cas. No. 6,561.　Such an addition of parties is, however, curable by amendment.　House v. Mullen, 22 Wall. 42; Heath v. Railway Co., 8 Blatchf. 347, Fed. Cas. No. 6,306.　Hubbard was a proper party plaintiff, inasmuch as he had become the pledgee of the certificates, and had an equitable interest in them.　He did not have the absolute title to these choses in action, and had only a special property in them, for the title of the pledgors had apparently not been devested, and there is no averment of their insolvency or inability to pay the debt for which the certificates were a security. They were therefore also proper and necessary parties to the bill; for where the assignment of a chose in action "is not absolute and unconditional, or the extent or validity of the assignment is disputed or denied, or there are remaining rights or liabilities of the assignor which may be affected by the decree, he is not only a proper, but a necessary, party."　Story, Eq. Pl. § 153; Montague v. Lobdell, 11 Cush. 111.　This demurrable defect for want of parties was not apparently cared for by the pleader; for, if it had been, he would have demurred specially, and would have pointed out the proper parties, for the purposes of an amendment.　1 Daniell, Ch. Pl. & Prac. 287.　The bill is, however, apparently defective in this regard, upon its face; and the defect ought to be cured by an amendment, which can be directed at the instance of the court, even on appeal.　Lewis v. Darling, 16 How. 1.

The title of Hubbard is said to be incurably defective, because the consent of the improvement company was not obtained to the assignment to the Garretson partnership.　The certificates declared that

they were negotiable only by transfer upon the books of the company, and with the assent of the company first obtained thereto. It has been held that when the rules of a corporation provided that a transfer of the shares of its stock should not be valid in law or in equity unless approved by the company, such a provision was a condition precedent to a valid title (Walburn v. Ingilby, 1 Mylne & K. 61); but the provision in the certificate did not prevent the vesting of a complete equitable title in the assignee by an absolute and unconditional assignment, and such a title is sufficient for the requirements of the courts of equity in this country (Story, Eq. Pl., supra; Trecothick v. Austin, 4 Mason, 16, Fed. Cas. No. 14,164).

The question whether the bill makes out a case for relief is one of importance. The circular and the certificates which were to be given to Garretson and others stated that the subscribers were to receive railway bonds, but did not say of which road, whether of one of the three sections, or of the consolidated "Pacific Short Line." The complainants would have apparently had no adequate cause of complaint, unless they could show that some new or modified agreement existed which entitled them to the bonds as they were actually issued upon a completed piece of road, and which made the defendant, as a party to the new agreement, a bailee of these bonds for their benefit. The allegations of the bill, in regard to this new agreement, are vague as to the time when it was made, silent as to a new consideration, and were evidently intended to state an agreement in very general terms; but they aver that there was an understanding and agreement by the defendant that the bonds of the Nebraska Railway, when issued, on account of the Covington-O'Neill section, should be set apart and reserved for delivery to the certificate holders at the time specified in the certificates, and that the defendant received and held all the bonds with knowledge that they were the bonds thus set apart, and with the agreement that it would receive and would hold them in trust for the certificate holders. It thus appears that, whereas the original agreement simply provided for the delivery of bonds within two years from its date, meanwhile, the improvement company having the right to use them as it pleased, the new agreement provided that the Nebraska bonds were, as soon as issued, to be set apart for the certificate holders, and that, when they were received by the defendant, they were received with the knowledge and upon the agreement that they were to be held upon this trust. Whether the bonds were hypothecated simultaneously with their delivery to the defendant, or after they had been received upon this agreement, does not appear; but it does appear that, whenever received, such reception was with full knowledge of the obligation to hold them for the certificate holders. The effect of this modification apparently was that, when the certificates of Garretson and his associates said that they were entitled to "Railway bonds," the modification said that the bonds were to be those of the Nebraska Railway. Moreover, it appears that Peirce and Chase actually received from the improvement company certificates for Nebraska Railway bonds, which were countersigned and registered by the defendant in June and September, 1890, so that the modified

agreement did not apparently rest in an unexecuted promise. These averments say, not however, with a commendable definiteness, that the defendant had, at the time when the bonds upon the completed section of the Nebraska road were hypothecated, agreed to hold them as a custodian for the certificate holders, and that it received the bonds with full knowledge of its own relation to them, but that it disregarded its duties as a trustee. It cannot be said upon demurrer that the averments of the bill do not state a cause of action which entitled the complainants to relief.

The next cause of demurrer is that the causes of action are stale, and that so long a time elapsed before the happening of the matters alleged that it would be contrary to equity to take cognizance thereof. It is averred that the improvement company became in the latter part of 1890 hopelessly insolvent, and went into the hands of receivers, and the defendant sold all the hypothecated bonds and stock during the year 1890. The complainants were entitled to receive the bonds in May, 1891. The bill was verified August 24, 1896. It is averred in the most general terms that the hypothecation was fraudulently concealed from the complainants, and that they did not learn of the wrongs alleged until after the sale, and in another part of the bill, until long after the sale of the bonds and stock. The bill does not seek to set aside the foreclosure, but to have the defendant account for their proportion of the avails of the bonds and stock. The defense of staleness is not the defense that a lapse of time has taken place since the cause of action accrued, which has created a bar analogous or akin to the bar created by the statute of limitations. "Laches is not, like limitation, a mere matter of time, but principally a question of the inequity of permitting a claim to be enforced" (Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873); and, when this inequity exists, a court of equity will refuse relief, although the time which has elapsed since the alleged injury is less than that which is made a bar by the statute of limitations (Alsop v. Riker, 155 U. S. 448, 15 Sup. Ct. 162). This inequity often arises from the changed value of the property during the time which has elapsed since the date of the transactions which are the subject of the suit, or from the changed relation of the parties to the property, as when a sale has taken place, and new rights have arisen. This class of cases frequently appears in the later volumes of reports of the supreme court, some of which are cited in Galliher v. Cadwell, supra. This case is not one of the class where the value of the property has risen greatly while the complainant slumbered, or where new rights have arisen. Examples of the latter state of facts are found in Harwood v. Railroad Co., 17 Wall. 78, which was brought to upset a decree of foreclosure of a railroad, five years after it was entered, "under which new rights and interests must necessarily have arisen"; and in Foster v. Railroad Co., 146 U. S. 88, 13 Sup. Ct. 28, which was also to set aside a foreclosure of a railroad under a mortgage, 10 years after the date of the decree. In a bill to obtain relief from an alleged, but concealed and recently discovered, fraud, it was always held that there must be distinct averments as to the time of

the discovery of the fraud, how the knowledge was obtained, why it was not obtained earlier, and as to the diligence previously used in the investigation of the fraudulent transaction, so·that a court could discover from the bill itself whether the complainant had not lost his rights by his negligence.   Stearns v. Page, 7 How. 819.   It therefore naturally resulted that "a defense grounded upon the staleness of the claim asserted may be made by demurrer."   Lansdale v. Smith, 106 U. S. 391, 1 Sup. Ct. 350.

The defendant, in discussing the recognized extent of the power of a court of equity to dismiss a bill for insufficiently excused laches, cites particularly Hardt v. Heidweyer, 152 U. S. 547, 14 Sup. Ct. 671, where, upon a demurrer to a bill in equity, brought for the purpose of compelling fraudulently preferred creditors of a partnership to account to the general creditors for all the property which came into their hands by virtue of the alleged inequitable transactions with the partnership, the bill, which was brought five years after the transfers were made, was dismissed absolutely, upon the ground that it "must be held deficient in not showing how knowledge of the wrongs complained of was obtained by the plaintiffs," and why they did not previously ascertain the same facts.   The case was that of an inactive creditor, who sought to make a preferred creditor account for the property which he received, and to account for it at its true market value, and not at the amount which was realized from it; and the excuse for inaction was simply a reliance upon the representations of the preferred creditor that the transactions were not fraudulent.   If this was the only excuse that the complainants had, the court deemed it unnecessary to spend more time in the litigation.

It has frequently been pointed out that each case of laches depends upon its own circumstances, and that no inflexible rule can be established in regard to the length of time which shall be held to constitute undue delay, or in regard to·the vigilance which shall be required.   In the case at bar the defendant is alleged to have entered into the relation of a trustee for the complainants, and to have disposed of the property for its own benefit.   The bill showed an unseemly delay, and a sufficient excuse for the complainants' inaction was necessary.   The pleader recognized this necessity, but averred in the most general terms that they were ignorant, and that the defendant concealed the hypothecation,—general averments, which have always been held to be ·insufficient.   Stearns v. Page, 1 Story, 204, Fed. Cas. No. 13,339; Wood v. Carpenter, 101 U. S. 135; Feli_ v. Patrick, 145 U. S. 317, 12 Sup. Ct. 862; Hardt v. Heidweyer, supra. The bill is plainly demurrable, but the question is, shall it be dismissed, or shall the complainants be permitted to attempt to remedy it?   If the bill was of the inequitable class already mentioned, as, for example, if it was an attempt to upset established titles to property, it should be dismissed; but, as the bill presents itself upon its face, we prefer to follow the example of Judge Story, in Stearns v. Page, supra, who held that the court "had a right to require, before the bill is entertained, that a clear case should be made out, upon the very face of the bill, calling for its interposition, and showing

that the parties in interest have been guilty of no negligence or undue delay in not applying for relief at an earlier period," but granted leave for an amendment.

We have said nothing in regard to the stock of Peirce, which was not to be delivered until 1893, because the bonds were in 1890 the only thing of value which is the subject of the suit. Where a circuit court dismissed a bill generally upon demurrer, and the supreme court, upon appeal, was of opinion that the bill was demurrable, but amendable, it reversed the decree, and remanded the case, with directions to allow the complainants to amend their bill. House v. Mullen, 22 Wall. 42. Let the decree be reversed, without costs of this court, and the case be remanded to the circuit court, with directions to allow the complainants to amend their bill in conformity with this opinion, or, if they fail to do this in a reasonable time, to dismiss it, with costs.