## BAIRD v. FRANKLIN.

## NEW YORK YACHT CLUB v. SAME.
### Nos. 104, 105.

Circuit Court of Appeals, Second Circuit.
Feb. 25, 1944.

Granville Whittlesey, Jr., of New York City (Donovan, Leisure, Newton & Lumbard, Theodore S. Hope, Jr., and John A. Morhous, all of New York City, on the brief), for plaintiff-appellant Mary Stevens Baird.

William Greenough, of New York City (Patterson, Eagle, Greenough & Day and J. Harlin O'Connell, all of New York City, on the brief), for plaintiff-appellant New York Yacht Club.

William Dean Embree, of New York City (Milbank, Tweed & Hope, Lawrence Bennett, and Edward N. Perkins, all of New York City, on the brief), for defendant-appellee.

Milton V. Freeman, Asst. Sol., Securities and Exchange Commission, of Philadelphia, Pa. (Orrin C. Knudsen, Counsel, Trading and Exchange Division, and W. Victor Rodin, Atty., Securities and Exchange Commission, both of Philadelphia, Pa., on the brief), for Securities and Exchange Commission as amicus curiae.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

In the opinion of a majority of the court the judgments must be affirmed. The facts are stated in Judge CLARK'S opinion and need not be here repeated.

 We accede to the view that the Stock Exchange violated a duty when it failed to take disciplinary action against Richard Whitney on November 24, 1937, after there was reason to believe that the latter had converted the plaintiffs' securities. But to justify a judgment in favor of either plaintiff, such a breach of duty must have resulted in damage that can be traced to the breach. We can see no substantial resemblance between the duties of bailees or other fiduciaries and those of the Stock Exchange. The duties of the former are to safeguard property over which they have some right of control. In the case of the Exchange there was no duty except to investigate the dealings and the financial conditions of the members and to suspend or expel members who it had reason to believe had been guilty of conduct inconsistent with just and equitable principles of trade. It appears from the record that by reason of unauthorized pledges the securities had all been converted prior to November 24, 1937, and were then in the possession of pledgee banks and so remained for some time thereafter, though at certain times all of them were returned to the pledgor and during the same day repledged to secure other loans. We can see no likelihood that the expulsion or suspension of Richard Whitney when his conversions came to the notice of the officers of the Exchange on November 24, 1937, would have in the least benefited the plaintiffs for the securities were then all converted and in the hands of pledgees.

It is argued that Richard Whitney's brother, George, might have advanced money to Richard sufficient to redeem the securities just as was done in the case of the Gratuity Fund. But there is no reason to suppose that action by the Exchange on November 24 would have brought relief to Richard or the plaintiffs. On the other hand there is good ground for believing that it would not only have brought no relief to the plaintiffs but would have prevented the salvage of the Gratuity Fund since the additional loans to Richard were undoubtedly made to save his name and to prevent the exposing of a major scandal.

It is further suggested that George estimated the liquidating value of his brother's estate at $500,000. But this estimate was shown to have been based on false statements by Richard as to the value of his distilling business. As the record stands, there is every reason to believe that in November, 1937, Richard was hopelessly insolvent and that he only obtained a loan through his brother by means of false statements and because of the latter's belief that exposure would be averted if he furnished enough money to redeem the Gratuity Fund. Whether George would or could have procured more money for Richard is a matter of speculation. He surely would not have done so if Richard's dealings with customers' securities had been exposed for after there was exposure the loans ceased to be made.

 The plaintiffs presented their proof upon the theory that they had valid claims against the Stock Exchange on account of its failure to take action against Richard Whitney on November 24, 1937, and that their loss was the result of that failure. The cases were tried on the only possible theory on which recovery could have been hoped for. The plaintiffs were allowed to introduce all the proof of damages they desired. They had the burden of showing that the breach of duty was the cause of their loss. We think that they have failed to show this and have presented claims of damage resting on the merest speculation with all reasonable chances against practical realization.

On the record the trial judge would not have been justified in any finding that the plaintiffs suffered damage and he in fact found to the contrary. ("Fifth" and "Sixth" Conclusions of Law.) The plaintiffs have had their day in court with an opportunity to offer their proof, which they presented unchecked. Under such circumstances there can be no basis for a new trial and the judgment is affirmed.

240

CLARK, Circuit Judge (dissenting, in part from the opinion, and from the judgment).

This is an appeal from a judgment dismissing the complaints of Mary Stevens Baird and The New York Yacht Club in actions brought against the New York Stock Exchange to hold the latter liable for the loss of plaintiffs' securities through embezzlement by Richard Whitney. The actions were consolidated below for joint trial under Federal Rules of Civil Procedure, rule 42(a), 28 U.S.C.A. following section 723c, and have been consolidated for the purposes of appeal. The named defendant is the treasurer of the Exchange, who is sued as representing the Exchange pursuant to New York General Associations Law, § 13, Consol.Laws, c. 29. Jurisdiction of the district court is based upon the Securities Exchange Act of 1934, § 27, 15 U.S.C.A. § 78aa.

Richard Whitney was senior partner in the New York Stock Exchange firm of Richard Whitney & Co. and owned a seat on the Exchange. From 1928 until March 8, 1938, he was treasurer of plaintiff The New York Yacht Club, which position made him the lawful custodian of all securities owned by the Club and gave him sole access thereto. As broker for plaintiff Mary Stevens Baird during the same period, Whitney was also entrusted with a large number of her securities. For some time before November 22, 1937, and until January 26, 1938, Whitney, involved in speculations in the stock of a liquor company, had been criminally hypothecating the securities of both plaintiffs without their knowledge or consent for loans made to him personally. On January 26, 1938, he paid off the loans for which the securities stood at that time as collateral, but later in the same day he repledged them with the Public National Bank & Trust Company and the New York Trust Company for new loans made to himself. This was all part of the vicious circle in which Whitney was caught as the threat of disclosure impended. As one creditor started to press him, he was forced to pay that loan off, redeem the collateral, and then immediately put it out on another loan from some other source.

In 1937, the Stock Exchange maintained for the benefit of the families of deceased members an invested fund, amounting to some $2,000,000 in cash and securities, known as the Gratuity Fund. Under the Constitution of the Exchange this fund was managed by seven trustees "acting as agent for the Exchange." [1] These trustees consisted of the president and the treasurer of the Exchange and five elected trustees, including, as chairman, Edward Henry Harriman Simmons, president of the Exchange from 1924 to 1930 and member of its Law Committee and of its Governing Committee (on which he had served for twenty-four years), and, as members, Blair Williams, who was a member of the Exchange's Business Conduct Committee and Governing Committee (on which he had served for thirty-two years), and Whitney, who was the broker selected to execute transactions for the fund. Whitney, too, had served as president of the Exchange in 1930–1935, and at this time was a member of long standing of the Governing Committee, as well as of other committees of that Exchange. At a meeting of the trustees on November 22, 1937, which Whitney did not attend, it was decided that a block of $200,000 railroad bonds which had been delivered to Whitney for sale two months previously should not be sold, but should be returned. Thereupon the clerk to the trustees announced that, in addition to the railroad bonds, Whitney had in his possession, despite five demands from the clerk, $700,000 in other bonds and some $221,000 in cash which belonged to the Fund.

Simmons and the other trustees were exceedingly surprised at this news, for it had long been Whitney's custom to give meticulous accountings to the trustees of his transactions with the securities and cash of the Fund. Simmons, therefore, immediately telephoned Richard Whitney & Co. It was about three o'clock in the afternoon, and Whitney was not in; but his partner, Rodewald, was reached, and the latter stated that the securities and

[1] Constitution of the New York Stock Exchange, 1934, Art. XXIII, § 1. By Art. XXII, the Exchange pledged itself to make a "voluntary gift" to the family of each deceased member of $20,000, by collections of $15 per member, which sum, in turn, was a "voluntary gift" from the member. Income on the Gratuity Fund was to be turned over by the trustees to the treasurer of the Exchange yearly to reduce the payments by the members.

cash would be returned the following day. Later that afternoon Whitney himself called back to confirm Rodewald's promise. By noon the next day, however, no action had been taken. Instead, Whitney called on Simmons to ask for another day of grace. This request was peremptorily turned down; so Whitney went to his brother, George Whitney, of J. P. Morgan & Co., and told him of his defalcations and the trouble he was in. George having agreed to make good for his brother, Richard returned to Simmons and said to him: "Everything is all right; I will have everything over for you tomorrow; * * * I have been over to talk to my brother George * * *." Satisfied by this, Simmons then granted the requested delay.

Prior to Whitney's second visit, however, Simmons had reported the occurrence to Roland Redmond, counsel for the Exchange, and to his fellow trustee, Blair Williams. Redmond, when advised that Richard had been to see his brother, advised Simmons to go over himself and talk to George, in order to try to discover if there was any question "about Mr. Richard Whitney being able to continue in his business the next day." This he did, and he was reassured by George Whitney that things were all right. Simmons testified that at this point he knew that there was danger of Richard Whitney's being suspended the next morning; that Whitney had used the cash of the Gratuity Fund for his own personal affairs without permission from the trustees; that Whitney had borrowed the money to restore the Fund from his brother because he had not the proper assets to raise such sums at a bank; and that the effect of George's financial assistance had been merely to substitute George as a creditor in place of the Gratuity Fund, without changing Richard's asset position in the slightest. Blair Williams, who was cognizant of all the events that had transpired, also testified that he realized that they meant Whitney was in no financial position to restore the cash or securities to the Fund or even to raise a loan to cover the amount.

The next day, November 24, 1937, Whitney returned the securities and cash to Simmons. Then on the day following, Thanksgiving Day, George and Richard had a financial conference. Simmons was called in and told that Richard Whitney & Co. was to be liquidated, but that Richard Whitney had a probable net worth of around $500,000. There were no additional developments until a week or two later, when Blair Williams, who was sitting at the time on a Business Conduct Committee investigation of the misuse of customers' securities by another firm, asked Simmons if perhaps the Whitney incident should not be reported to the Committee. Simmons replied that George Whitney was taking care of everything and that Richard Whitney & Co. was to be liquidated, a fact which should not be "gossiped about." No action was, therefore, taken. In fact, when both Simmons and Williams were later questioned by the chairman of the Business Conduct Committee on the matter, neither revealed a particle of what they knew.

Around the middle of January, 1938, rumors began to circulate about the impending collapse of Richard Whitney & Co. Some of these reached the ears of the chairman of the Business Conduct Committee, who ordered a Stock Exchange questionnaire to be sent to the Whitney firm that month. The answer to the questionnaire was received on February 21, and an immediate preliminary analysis showed that Whitney & Co. was operating with less than the capital requirements of the Exchange. Accountants were then sent to the firm's office, who reported back evidence of misuse of customers' securities. This report was confirmed by the comptroller of the Exchange, and the president of the Exchange ordered that misconduct charges be drawn up over the week-end of March 5. These were presented to the Governing Committee on March 7; the following day Richard Whitney & Co. closed its doors. Thereupon, the banks to which plaintiffs' securities had been pledged demanded immediate payment, and on nonpayment sold the securities in satisfaction of the loans. The loss claimed by The New York Yacht Club is $105,184.13, that by Mary Stevens Baird, $98,758.50.

The New York Stock Exchange is a voluntary association of individuals dealing in securities through an organization based upon a Constitution signed by each member, whereby he pledged himself to abide by the Constitution and all rules and regulations adopted thereto. One of the objects of the association as expressed in the Constitution then in force was to promote and inculcate just and equitable prin-

ciples of trade and business, and any violation of this aim was punishable by expulsion from the Exchange.[2] The Rules of the Exchange provided that improper use of a customer's securities, failure to earmark securities paid for in full by customers, and willful violation of any provision of the Securities Exchange Act of 1934, or any rule or regulation thereunder, should all comprise conduct inconsistent with just and equitable principles of trade.[3] These provisions followed the terms of § 6(b) of the Securities Exchange Act, 15 U.S.C.A. § 78f, and were inserted into the Rules as a prerequisite to registration as a national securities exchange with the Securities and Exchange Commission. The Exchange applied for registration around September 1, 1934, having shortly before that executed the agreement, required by § 6(a) (1) of the Act, "to comply, and to enforce so far as is within its powers compliance by its members, with the provisions" of the Act. On September 28, 1934, pursuant to the power vested in it by § 6(d) of the Act, the Commission adjudged the Rules of the Exchange to be "just and adequate to insure fair dealing and to protect investors," and granted the application.

Plaintiffs base their actions on two alternate and distinct theories. The first is that on or about November 24, 1937, the defendant New York Stock Exchange knew that Richard Whitney was guilty of unlawful acts and conduct inconsistent with just and equitable trade, in that he had permitted his aggregate indebtedness to exceed a certain percentage of his net capital within the meaning of § 8(b) of the Securities Exchange Act, 15 U.S.C.A. § 78h(b), had hypothecated, contrary to the provisions of § 8(c) and (d) of the Act, certain securities of the Gratuity Fund without consent of the trustees, and had used the mails to transmit false statements of the Gratuity Fund account in violation of § 10(b) of the Act, 15 U.S.C.A. § 78j (b); that from November 24, 1937, until on or about March 7, 1938, the defendant continuously and willfully violated § 6(b) of the Act by failing to take action towards the expulsion, suspension, or discipline of Richard Whitney for his unlawful conduct; and that, since the Act was enacted for the benefit and protection of customers of members of registered exchanges and of such members of the general public, including plaintiffs, as might carry on security transactions with members of a registered exchange, plaintiffs were vested with a right of action by § 6(b) to recover from defendant the amount of their losses which resulted from the latter's violation of the Act. The second theory is that on the basis of the same facts recovery should be granted to plaintiffs as third-party beneficiaries of the agreement filed by defendant with the Securities and Exchange Commission pursuant to § 6(a) (1) of the Act.

In dismissing the complaints below, the district court made sixty-two findings of fact and reached eight conclusions of law. Plaintiffs allege that four of the former, Nos. 44, 45, 58, and 59, and all of the latter are clearly erroneous. Finding of Fact No. 44 is that Simmons did not believe on November 24, 1937, that Richard Whitney had hypothecated any securities of the Gratuity Fund, but merely felt that the delay was caused by "inability to raise the full amount of the credit [cash] balance." No. 45 carries this theme further with the

---

[2] The government of the Exchange, including "the regulation of the business conduct of its members," was vested by the Constitution in the Governing Committee, composed of the president and the treasurer of the Exchange and forty members, of whom ten were elected each year. Its activities were largely carried on by Standing Committees from its membership, whose duties were defined by the Constitution. Of these, the most important for our present purposes were the Committee on Business Conduct and the Law Committee. The former was charged with the duty of considering matters relating to "the business conduct and financial condition of members and their customers' accounts," with power to investigate the "dealings, transactions, and financial condition of members" and to "advise" the president, who might suspend a member when so advised, and to report to the Governing Committee, who might expel a member. The Law Committee acted in an advisory capacity to the president, and in association with that officer represented the Exchange in all matters affecting its general interests and was "authorized and empowered, in its discretion, to examine into the dealings of any member of the Exchange." Constitution, 1934, Arts. II, III, X, XVI, XVII.

[3] Cf. Rules Adopted by the Governing Committee Pursuant to the Constitution, 1934, c. XII, §§ 2–5, c. XIV, § 16, c. XV, § 3.

statement that until shortly before March 4, 1938, Simmons and Williams had no reasonable cause to suspect a hyopthecation of securities by Whitney, while Nos. 58 and 59 hold the Exchange blameless of knowledge or reasonable cause to suspect that Whitney was guilty of conduct inconsistent with just and equitable principles of trade until after the report of the accountants was turned in on February 23, 1938. The gist of the conclusions of law is that the Stock Exchange owed no duty to plaintiffs under the Securities Exchange Act of 1934, that plaintiffs were not third-party beneficiaries of the § 6(a) (1) agreement, and that in any event the omission of the Stock Exchange to take action was not a proximate cause of the losses.

The scope of appellate review of basic facts is, of course, limited to disturbing only those "clearly erroneous." Here, however, the basic facts were not in conflict or dispute, and we have to deal only with those final and ultimate inferences as to states of mind and standards of reasonable notice or duty to inquire, which really decide the case. Kuhn v. Princess Lida, 3 Cir., 119 F.2d 704; Murray v. Noblesville Milling Co., 7 Cir., 131 F.2d 470, certiorari denied 318 U.S. 775, 63 S. Ct. 832. On the evidence we are unable to accept either as fact or law the inferences and conclusions drawn by the district court from the undisputed testimony of the witnesses (all called by the plaintiffs), particularly of Simmons and Williams. Hence for the four contested findings we would substitute one finding to the effect that on or about November 24, 1937, the Stock Exchange had knowledge that Richard Whitney or Richard Whitney & Co. was guilty of conduct inconsistent with just and equitable principles of trade, within the meaning of the Securities Exchange Act of 1934 and the Rules and Regulations of the Stock Exchange, in that he had converted to his own use cash belonging to the Gratuity Fund, had hypothecated for personal loans securities owned by that Fund, had failed to maintain the credit balance required by § 8(b) of the Act, and had issued through the mails false statements regarding the Gratuity Fund account, in violation of § 10(b) of the Act.

Simmons admitted that he knew on November 24, 1937, that Whitney had converted the cash balance of the Gratuity Fund to his own use without having sufficient assets even to raise a loan to cover the amount. That this was embezzlement under § 1290(2) of the New York Penal Law, Consol.Laws N.Y.C. 40, People v. Meadows, 199 N.Y. 1, 92 N.E. 128, and conduct inconsistent with just and equitable principles of trade can hardly be denied. Section 6(b) refers definition of such conduct to the rules of the particular exchanges, and Ch. XII, § 3, of the Stock Exchange Rules provides that "reckless and unbusinesslike dealing is inconsistent with" those principles. Knowledge of the conversion of the cash necessarily implies, too, the additional knowledge that the Fund securities had been illegally hypothecated contrary to § 8(c) and (d) of the Act, for the evidence clearly shows that the restitution transaction between Whitney and Simmons was regarded as a whole. The clerk to the Fund initially reported both the cash and the securities to be missing; Simmons asked Rodewald to return both; Whitney demanded an extension for both, and, after having talked with his brother George, he said that he would return both the following day. Furthermore, George Whitney testified that Simmons certainly seemed interested in the return of the securities, as well as the cash; and Simmons himself was even forced into a similar admission, although he had hitherto denied that he was ever at all worried about the securities. Since the cash and the securities were thus regarded as one entity to be returned to the Fund, knowledge of the embezzlement of the cash, plus Whitney's inability to return the securities, must have informed Simmons, or at the very least given him reasonable cause to suspect, that the securities had been illegally hypothecated.

Simmons also was in possession of ample facts to indicate that Whitney on November 24, 1937, was operating in violation of § 8(b) of the Act, which provides that a broker must be in such condition that after offsetting his indebtedness to all persons against his assets, "exclusive of fixed assets and value of exchange membership," he shall have a net surplus equal at least to one-twentieth of his indebtedness. Simmons realized that Whitney had neither the cash nor capital sufficient to enable the raising of an equivalent loan, and this could mean only that Whitney's net capital position in terms of § 8(b) was something

less than zero. Simmons also testified that he knew that the loan by George Whitney did nothing but substitute George in the place of the Gratuity Fund as Richard's creditor. George's Thanksgiving Day assurance that Richard would probably liquidate at around $500,000 could not have changed matters any, for Simmons understood that such liquidation contemplated all of Whitney's assets, including fixed assets and some $300,000 worth of seats on the Exchange.

Simmons and Williams, finally, knew that Whitney was guilty of violating § 10(b) of the Act, in that he had used the mails to submit false statements to the trustees of the Gratuity Fund. Securities had been reported which they knew in fact had been hypothecated and were no longer in Whitney's possession, while the account of November 1, 1937, stated that Whitney held some $222,000 in the cash credit balance of the Fund. This cash balance remained with Whitney "in connection with the purchase or sale of" securities for the Fund; hence the false statement regarding that sum was also a direct violation of § 10(b). Since Simmons and Williams acquired knowledge of all these facts in the discharge of their duties as agents of the Stock Exchange on the Board of Trustees of the Gratuity Fund, their knowledge is conclusively imputed to the Exchange. It is fundamental that knowledge so acquired by an agent is the knowledge of his principal. Restatement, Agency, 1933, § 272. This is certainly not less so where, as here, both were governors of the Exchange; Simmons was a member of the important Law Committee; and Williams was a member of the Business Conduct Committee charged with the very duty of acting in such cases.

There can be no doubt that § 6(b) places a duty upon the Stock Exchange to enforce the rules and regulations prescribed by that section. Any other construction would render the provision meaningless. Defendant's argument that the Securities Exchange Act did not alter the prior status of the Stock Exchange Rules as by-laws of a private club is untenable. If all that

§ 6(b) meant was that every exchange should pass token regulations, incapable of enforcement except at the wish of the exchange itself, there would have been no purpose for its inclusion in the Act. Sections 6(b) and (d) were surely intended to be read together, and the latter makes it clear that the purpose of the requirements of the former is "to insure fair dealing and to protect investors." This can be realized only if § 6(b) is construed as imposing the twofold duty upon an exchange of enacting certain rules and regulations and of seeing that they are enforced.

The Stock Exchange, therefore, was under a duty on November 24, 1937, to take disciplinary action against Richard Whitney for the various violations of the Securities Exchange Act and the Rules of the Exchange which it either knew of or at least had reasonable cause to suspect. Its complete inaction for some two months was a dereliction of that duty and a violation of § 6(b) of the Act. The violation being clear, the further question now arises as to whether a right of enforcement is vested by the Act in plaintiffs as members of the investing public or as third-party beneficiaries of the § 6(a) (1) agreement between the Commission and the Exchange. Our considered opinion is that the Act itself grants the right of action; hence it is unnecessary to consider the narrower contract problem.

One of the primary purposes of Congress in enacting the Securities Exchange Act of 1934 was to protect the general investing public. Section 2, 15 U.S.C.A. § 78b, states that "transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest," while § 6(d) specifically prescribes for the protection of investors. Some thirty-five other sections of the Act include similar references to this ideal.[4] Section 2 also states that another goal of the statute is to make the control of securities transactions "reasonably complete and effective." If these aims are to be followed by the Act, then, if the investing public is to be

---

[4] Secs. 5, 6(a) (2), 7(d), 9(a) (6), 9(b), 9(c), 10(a), 10(b), 11(a), 11(b), 11(c), 12 (b) (1), 12(b) (2), 12(d), 12(e), 12(f), 13(a), 14(a), 14(b), 15(b), 15(c) (3), 15(d), 15A(a) (1), 15A(b) (3), 15A(b) (4), 15A(b) (7), 15A (c), 15A(h) (2), 15A(j), 15A(k), 15A(l), 17 (a), 19(a), 19(b), 24, 30, 15 U.S.C.A. §§ 78e, 78f (a) (2), 78g (d), 78i (a) (6), (b, c), 78j (a, b), 78k (a–c), 78l (b) (1. 2), (d–f), 78m (a), 78n, 78o (b), (c) (3), (d), 78o-3 (a) (1), (b) (3, 4, 7), (c), (h) (2), (j–l), 78q (a), 78s (a, b), 78x, 78dd.

completely and effectively protected, § 6 (b) must be construed as granting to injured investors individual causes of action to enforce the statutory duties imposed upon the exchanges. The only two sections of the Act which impose express sanctions upon an exchange for violations are §§ 19 and 32, 15 U.S.C.A. §§ 78s, 78ff. The former permits, § 19(a) (1), the withdrawal of the registration of an exchange for a period not to exceed twelve months or the suspension for a similar period of any member or officer, § 19(a) (3); the latter prescribes a fine of not more than $500,000. Neither section, however, can be said to inure at all to the benefit of the defrauded investor, whom the statute professes to protect reasonably effectively and completely. Both are punitive and remedial measures, rather than compensatory; and while they may be of benefit to future investors, they do nothing for those who have already been the victims of overreachings.

What we said very recently in Charles Hughes & Co. v. S. E. C., 2 Cir., 139 F. 2d 434, 437, 438, can well be reiterated for this case. In determining that § 17(a) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a), permitted the Commission to revoke the registration of over-the-counter brokers who had fraudulently marked up the prices of securities sold by them, we stated that, since "the essential objective of securities legislation is to protect those who do not know market conditions from the overreachings of those who do," a construction of the Act as failing to sanction such action would "leave such legislation little more than a snare and a delusion." If § 6(b) here were to be construed as granting no right of action to plaintiffs, the avowed purpose of "reasonably complete and effective" protection would indeed be a snare and a delusion.

The fact that the statute provides no machinery or procedure by which the individual right of action can proceed is immaterial. It is well established that members of a class for whose protection a statutory duty is created may sue for injuries resulting from its breach and that the common law will supply a remedy if the statute gives none. Texas & P. R. Co. v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874; Abounader v. Strohmeyer & Arpe Co., 243 N.Y. 458, 154 N.E. 309; Pine Grove Poultry Farm v. Newtown By-

Products Mfg. Co., 248 N.Y. 293, 162 N.E. 84; Armour v. Wanamaker, 3 Cir., 202 F. 423. Nor is there any validity to defendant's objection that, since §§ 9(c), 16(b), and 18(a), 15 U.S.C.A. §§ 78i(c), 78p(b), 78r(a), grant specific rights of action in certain circumstances, the maxim "expressio unius est exclusio alterius" denies the implied right of action under § 6(b). Those three sections deal with special matters only indirectly germane to the regulation of securities exchanges; they provide for more unrestricted recovery than would be possible at common law; and they prescribe narrow statutes of limitation. Also, § 28(a), 15 U.S.C.A. § 78bb(a), directly states that "the rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity." As the Supreme Court has very lately said: "Some rules of statutory construction come down to us from sources that were hostile toward the legislative process itself and thought it generally wise to restrict the operation of an act to its narrowest permissible compass. However well these rules may serve at times to aid in deciphering legislative intent, they long have been subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy." Securities and Exchange Comm. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 350, 64 S.Ct. 120, 123.

Granted a right of action in plaintiffs, then, the final question is as to damages and whether the Exchange's breach of duty was a proximate cause of plaintiffs' losses. Here it would seem, having in mind the broadly remedial character of the statute, Smolowe v. Delendo Corp., 2 Cir., 136 F. 2d 231, 239, certiorari denied 320 U.S. 751, 64 S.Ct. 56, as well as the general law of proximate cause, that a practical result should be envisioned as to whether the Exchange's failure to act, reasonably viewed, resulted in all probability in monetary loss. The classic statement of the applicable principle is to be found in Davis v. Garrett, 6 Bing. 716, 724, 130 Eng.Rep. 1456, 1459 (C. P. 1830): "But we think the real answer to the objection is, that no wrong-doer can be allowed to apportion or qualify his own

wrong; and that as a loss has actually happened whilst his wrongful act was in operation and force, and which is attributable to his wrongful act, he cannot set up as an answer to the action the bare possibility of a loss, if his wrongful act had never been done. It might admit of a different construction if he could shew, not only that the same loss might have happened, but that it must have happened if the act complained of had not been done; but there is no evidence to that extent in the present case." And so here the loss would appear to be quite simply the difference between what plaintiffs would have received had the Exchange fulfilled its duty and what they actually now receive. Translated into terms of the present case it appears to be the value of plaintiffs' securities properly realizable when the duty to act first was presented to the Exchange, less the amounts, if any, recovered from Whitney's estate. In other cases there might develop quite an issue of fact as to when, in the light of the Exchange's rules and regulations, as well as its knowledge or notice in a particular case, its duty to act arose; but here there is no claim or proof placing it before November 24, 1937. At that time, however, it should have required Whitney either to meet his obligations or to suspend. It may not be easy to place an exact worth upon plaintiffs' interests in their respective securities at that time in the light of Whitney's condition, the chance that he might obtain means to continue, or the amount he then would have been able to pay on liquidation; but it seems no more difficult than in many similar problems of valuation. We recently considered the valuation of a right or claim, in Oosterhuis v. Palmer, 2 Cir., 137 F.2d 322, 326, and we stated the principle here applicable, relying particularly on the leading case of Gould v. Cayuga County Nat. Bank, 99 N.Y. 333, 340, 2 N.E. 16, 19. See, also, Brooklyn Eastern District Terminal v. City of New York, 2 Cir., 139 F.2d 1007; 4 Bogert, Trusts and Trustees (1935) § 862, p. 2501.

A further phase of this question, quite crucial in the particular case, arises because of the fact that no evidence of value of the plaintiffs' rights as of November 24, 1937, was introduced below, the plaintiffs relying upon their contentions that they had shown a prima facie case for the full amount and the defendant introducing no evidence. A majority of the court is of the view that the plaintiffs have the burden of showing the extent of their damage and, therefore, cannot be aided by any theory of a prima facie case. And since they were not circumscribed in their proof by the trial court, they must stand by the case as made. The judgments are, therefore, affirmed.

The writer hereof feels constrained to dissent from the ruling that the burden of the evidence as to damages remained with the plaintiffs throughout. It is his view that under the circumstances the plaintiffs had shown a prima facie case of damage, placing the burden of going forward with the evidence upon the defendant. He would feel that in any event the policy of the statute is such as to create an obligation of a fiduciary nature upon the Exchange to act promptly for the benefit of investors dealing with a particular member as to whom a duty to act has been brought home to the Exchange, and that then the cases putting a burden of explanaion on a fiduciary become applicable.[5] This would seem to follow because an investor not only is not in a position to know the facts about an Exchange member, but normally relies upon the standing given him by his membership, particularly in

<hr>

[5] Cf. Cutting v. Marlor, 78 N.Y. 454; In re Ziegler's Estate, 258 App.Div. 1077, 18 N.Y.S.2d 24; La Monte v. Mott, 93 N.J. Eq. 229, 107 A. 462, 116 A. 269; Lowndes v. City Nat. Bank, 82 Conn. 8, 72 A. 150, 22 L.R.A.,N.S., 408; and Preston v. Prather, 137 U.S. 604, 11 S.Ct. 162, 34 L. Ed. 788. And see, also, Davis v. Garrett, quoted above, and the illuminating discussion by Dean Morgan, 56 Harv.L.Rev. 1324, 1329, 1330. There are, of course, many useful analogies, such as the famous presumption and burden in admiralty against a ship in collision while violating a statutory rule, The Pennsylvania, 19 Wall. 125, 136, 86 U.S. 125, 22 L.Ed. 148 ("Such a rule is necessary to enforce obedience to the mandate of the statute"), and The Aakre, 2 Cir., 122 F.2d 469, certiorari denied Waterman v. The Aakre, 314 U.S. 690, 62 S.Ct. 360, 86 L.Ed. 552; or Great Southern Gas & Oil Co. v. Logan Natural Gas & Fuel Co., 6 Cir., 155 F. 114, 115, certiorari denied 207 U.S. 590, 28 S.Ct. 256, 52 L.Ed. 354 (confusion of goods), or F. W. Woolworth Co. v. N. L. R. B., 2 Cir., 121 F.2d 658, 663 (back pay order on finding of discrimination against a union).

view of the recent highly publicized statutory and other reforms of Exchange activities; whereas the Exchange itself has a complete machinery for keeping itself informed and for taking disciplinary proceedings against a member guilty of any impropriety. Any other rule seemingly imposes little responsibility upon the Exchange for carrying out the duty which we have found the Act to place upon it, and even provides an incentive, after the Exchange has become aware of a serious condition, for it to let matters drift, while it and its members having special knowledge protect themselves just as they did here—a result which, to my mind, borders on the immoral, in that it encourages a fiduciary to safeguard its own private interests while it allows its beneficiaries to suffer. If this is in any event a natural interpretation of the Act, the conclusion is strengthened here in the light of the special facts: first, that on November 24, 1937, at a time when George Whitney estimated his brother's liquidating value at $500,000, the events actually show Richard had and used a borrowing capacity of over $1,000,000, sufficient in actual fact to rescue the Exchange from its commitment, ten times deeper than any either of these plaintiffs had; and, second, that on January 26 and 28, 1938, all of these securities were redeemed and came back into Richard Whitney's possession, to be by him repledged. Under the circumstances I would think such repossession pointed necessarily to the conclusion that the legal damage to the plaintiffs occurred as a result of the repledging, and that it was up to the defendant to show the fact, if it be a fact, that the repossession was at most only formal and nominal and did not constitute legal dominion. But even if I am wrong as to this burden, I should still think that justice required a new trial on the issue of damage. We have undoubted power so to order where a case has been tried on a wrong theory, and the record does not permit of the determination of the actual questions involved with justice to all.[6] Here, had the issue upon which decision is made ultimately to turn been reasonably foreseeable, plaintiffs should properly be restricted to the record as made; but in view of the novelty and importance of the legal rights now determined, the fact that the rule of damage now announced was never stated or apparently foreseen by any of the parties or the trial court and, I venture to suggest with deference, is still somewhat in the realm of doubt, I do not believe the parties should suffer the extreme penalty of defeat final and irrevocable for having misguessed our views on a point of trial procedure. I would reverse on this issue.

---

[6] Thus, in Stewart v. Southern R. Co., 315 U.S. 283, 286, 62 S.Ct. 616, 86 L.Ed. 849, the Court, leaving for the disposition of lower courts other claimed errors, held that the failure to extract complete testimony from petitioner-appellant's own witness was ground for a new trial under the circumstances. See, also, Estho v. Lear, 32 U.S. 130, 7 Pet. 130, 8 L.Ed. 632; State of Minnesota v. National Tea Co., 309 U.S. 551, 555, 60 S.Ct. 676, 84 L.Ed. 920; Phillips v. United States, 312 U.S. 246, 254, 61 S.Ct. 480, 85 L.Ed. 800; United States v. Rio Grande Dam & Irrigation Co., 184 U.S. 416, 423, 22 S.Ct. 428, 46 L.Ed. 619; Rio Grande Dam & Irrigation Co. v. United States, 215 U.S. 266, 275, 30 S.Ct. 97, 54 L.Ed. 190; Finefrock v. Kenova Mine Car Co., 4 Cir., 22 F.2d 627; Newcomb v. York Ice Machinery Corp., 5 Cir., 56 F.2d 576, 578; Roosevelt v. Missouri State Life Ins. Co., 8 Cir., 70 F.2d 939, 944; In re Barnett, 2 Cir., 124 F.2d 1005, 1007; Benz v. Celeste Fur Dyeing & Dressing Corp., 2 Cir., 136 F.2d 845, 848; Hubbard v. Manhattan Trust Co., 2 Cir., 87 F. 51, 61. At least we should make it clear that on remand for re-entry of judgment the district court would have authority to consider a motion under Federal Rules of Civil Procedure, rule 60(b), if made. Perlman v. 322 West Seventy-Second Street Co., 2 Cir., 127 F.2d 716, 718–719; In re Barnett, 2 Cir., 124 F.2d 1005, 1012; Rogers v. Consolidated Rock Products Co., 9 Cir., 114 F.2d 108, 111; John Simmons Co. v. Grier Bros. Co., 258 U.S. 82, 42 S.Ct. 196, 66 L.Ed. 475.