## MURRAY v. NOBLESVILLE MILLING CO.

### No. 7996.

Circuit Court of Appeals, Seventh Circuit.

Nov. 25, 1942.

472

Warren W. Gardner, of Washington, D. C., Frank J. Delany, of Chicago, Ill., and Irving J. Levy, Acting Sol., Mortimer B. Wolf, Asst. Sol., Edward J. Fruchtman, and George W. Crockett, Jr., all of Washington, D. C., Attys., United States Department of Labor, amici curiae.

Harvey J. Elam, Howard S. Young, and Irving M. Fauvre, all of Indianapolis, Ind., for appellant.

Francis E. Thomason and Clarence B. Ullum, both of Indianapolis, Ind., for appellee.

Before EVANS, SPARKS, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This was an action brought by plaintiff as agent for and on behalf of twenty-four former employees of the defendant to recover unpaid compensation alleged to be due under § 7(a) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., and an equal amount as liquidated damages and reasonable attorney's fees. The case was tried without a jury. The District Court found for the plaintiff and rendered judgment for $5,997.56 for wages, together with a like sum for the use of the former employees as liquidated damages, and the sum of $1,000 as attorney's fees. To reverse the judgment, defendant appeals.

The complaint alleged that defendant and the employees were engaged in the production of goods for commerce and that the employees had performed overtime work for which they had received no extra compensation. Defendant admitted coverage of all but two of the employees but denied liability, claiming an agreement with the employees which provided for an hourly rate of pay in excess of the statutory minimum for the first 40 hours of the workweek and time and one-half that rate of pay for each hour thereafter.

The court found that prior to October 18, 1938, the defendant had an agreement with its employees to pay a stated sum per hour as wages for work to be performed, and that it was the practice of the defendant to have its employees work more than 44 hours a week. On October 18, the defendant called a meeting of its employees at which it advised them that it was not willing to pay overtime compensation based upon their present rate, but that it would not reduce their pay in respect to the total amount earned each week. The defendant proposed that for an average week of 60 hours an employee previously engaged at 40¢ an hour, be paid for the first 40 hours at 34¢ an hour, and for the remaining 20 hours, as his overtime compensation, at 51¢ an hour.

Since this method yielded only $23.80 as compared with $24 per week under the old rate of pay, the defendant promised to add a bonus of 20¢ to equal the old rate. Thereafter the defendant put the plan into effect, revised its bookkeeping system to reflect it, and the employees continued to work for the defendant until it closed its plant on or about March 10, 1941.

The court also found that the new pay arrangement was not a bona fide contract and that the employees never knew exactly how to figure their pay after October 18, 1938, but considered that it (original contract of employment) remained unchanged.

If this were an original proposition, our holding would be that this contract does not comply with the law, and that the "regular rate" must be calculated according to the formula stated in Overnight Motor Transportation Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682.

There can no longer be any question that Congress has the constitutional power to regulate hours even though they are not patently burdensome to health, that the method adopted by Congress was constitutional, and that the purpose of the overtime provisions of § 7 was to apply financial pressure upon the employer to reduce hours of work and spread employment. Missel case, supra. Where Congress has chosen a constitutional method to effect a purpose within its constitutional power, it is not our function to re-examine the wisdom of adopting maximum hour legislation. The duty of the court in this situation is one of statutory construction— to interpret the language of the statute so as to effectuate the intent of Congress.

Underlying the Fair Labor Standards Act is the proposition that two separate and distinct factors may influence agreements on wages and hours made be-

tween employers and employees—employee bargaining power, and the requirements of the law. Resting on this proposition, the Act has two major purposes: (1) to reinforce employee bargaining power concerning hourly wages by prohibiting wage rates below a certain level, and (2) to reinforce employee bargaining power concerning hours of labor by exerting financial pressure upon the employer to limit hours to a certain level.

■ In the instant case, the contract of employment contravenes the second of these purposes. So far as the employer is concerned, the contract is in practical effect a contract to pay 40 cents an hour for the first 60 hours of work in a week, and 51 cents an hour thereafter. Instead of financial pressure being exerted upon the employer after the statutory maximum number of hours of work, the pressure of increased wages is exerted only after a certain number of hours chosen by the employer himself—60 hours. Because there is no increase of labor cost between the statutory maximum and the hours guaranteed, the employer has a financial inducement to require hours beyond the statutory maximum. Is this the result intended by Congress? Such a contract complies with the provision of § 7 only in form, and even then only if "regular rate" is given the definition contended for by defendant. It is the substance of the contract, rather than its mere form, which should determine whether it complies with the Act.

■ To hold that this contract is sufficient under the Act is to render wholly ineffective (except in the unusual case in which the stated hourly rate is the statutory minimum) the method adopted by Congress to regulate hours of work. It is to construe the Act as though Congress had not enacted a separate section dealing with maximum hours, but had enacted § 7 as a part of § 6, intending the time and one-half provisions to influence only minimum wages, not maximum hours. The control of hours of work is once again dependent solely upon employee bargaining power, as it was before the Act was passed. It can be said that all the employees needed to do, if they did not want to work as much as 60 hours to receive $24, was to bargain for a higher stated hourly rate. But this is exactly what the situation was before Congress enacted § 7.

It is clear in the instant case that our holding makes the number of hours of work dependent solely on the strength of employee bargaining power. What of the case in which employees are not paid as they are here but are paid by the hour? It is true there as well, for it is only employee bargaining power which would bar such an employer from changing his employees to the type of contract present in this case, if he so desired.

■ The employees' desire to receive a weekly salary regular in amount would not be defeated by holding contracts such as the 60 hour contract in this case contrary to the law. Employees could still enter into contracts guaranteeing them the statutory maximum number of hours each week. If this did not provide them with as large a guaranteed weekly salary as they formerly received, any change in that situation was left by Congress to be effected through the exercise of employee bargaining power—the Act does not purport to fix weekly wages. The intent of Congress was that both employee bargaining power and the Act should influence hours of work, but that only employee bargaining power should influence wages so long as they were equal to or above the statutory minimum.

It has been argued that the courts should not attempt to define the term "regular rate" because the possibilities of variation in contracts are too great. However, it is impossible for a court, in passing upon a specific case, to avoid defining "regular rate" for that particular case. To hold that the contract before us complies with the Act is to give the term "regular rate" one meaning; to hold that such a contract is insufficient to comply with the Act is to give it another.

■ It has also been argued that the courts must give effect to the intention of the parties with respect to the regular rate of pay. However, our duty is to give effect to the intention of the parties only insofar as that intention complies with the law. In many familiar situations the intention of the parties is not permitted to defeat the announced policy of the legislature. Regardless of the intention of the borrower, money may not be loaned at a usurious rate of interest; regardless of the intention of the employee, an employer may not pay him wages less than the applicable minimum wage; regardless of a woman employee's intention, an employer may not require her to work more than the number of hours set by state statute. The

intention of the parties here should not be allowed to defeat the obvious intent of Congress in enacting the Fair Labor Standards Act.

We have already been told, however, in a case involving a contract which was in substance equivalent to the contract in this case, that "nothing in the [Fair Labor Standards] Act bars an employer from contracting with his employees to pay them the same wages they received previously, so long as the new rate equals or exceeds the minimum required by the Act." Walling v. Belo Corporation, 316 U.S. 624, 62 S.Ct. 1223, 1226, 86 L.Ed. 1716. This decision of the Supreme Court we must follow. The determinative question therefore is whether the old employees agreed to the abrogation of their existing contracts and entered into new ones, and also whether five new employees agreed to work for the new rates, rather than for a basic rate of 40¢ an hour.

In support of the judgment, the plaintiff calls attention to Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following § 723, which provides that findings of fact shall not be set aside unless clearly erroneous.

 To be sure, where the finding of fact is supported by evidence and is not clearly erroneous, it must be accepted by us, but the rule does not operate to entrench with like finality the inferences or conclusions drawn by the trial court from its fact findings and we are free to draw the ultimate inferences and conclusions which the findings reasonably induce, and where the evidentiary facts are not in conflict or dispute, the conclusions to be drawn therefrom are for the appellate court upon review. Kuhn v. Princess Lida of Thurn & Taxis, 3 Cir., 119 F.2d 704.

In the instant case, the essential facts, as to whether the employees in fact agreed to the abrogation of their existing contracts and the consummation of new ones, agreeing to work for the new rates rather than for a basic rate of 40¢ an hour, are not in dispute.

The evidence shows that prior to the effective date of the Fair Labor Standards Act, 17 of the defendant's employees were being paid 40¢ per hour, usually averaging 60 hours per week. On October 18, 1938, after the passage but before the effective date of the Act, defendant convened a meeting of its employees for the purpose of figuring out a plan, by which it could adjust its compensation system to meet the requirements of the Act. At this meeting defendant's secretary-treasurer advised the employees that he had worked out an arrangement whereby they could continue to work substantially 60 hours per week and receive a weekly wage of $24, but that in order to do so, it was necessary, in case of a 40¢ an hour man, to calculate his hourly rate on a basis of 34¢ in keeping with the law, and pay him for all hours over the maximum provided for in the Act at 51¢ per hour, which would approximate the same weekly wage he was receiving prior to the passage of the Act if he worked the full average workweek of 60 hours; that under the proposed plan an employee would receive $23.80 for 60 hours of work to which defendant would add a bonus of 20¢, thus bringing his pay to what it would have been under the old rate.

After this explanation, a motion was made that the employees in favor of letting the secretary-treasurer take care of it, "stand up." All the employees, with the exception of one absent employee, arose. Thereafter there was entered upon the defendant's books a notation that the basic rates of pay had been reduced in accordance with the understanding reached at the meeting, its records were revised to reflect the payment of the employee's compensation at the new rates, and for two and one-half years thereafter all the employees received their pay each week accordingly.

The evidence in this case shows that the employees understood the meeting of October 18 was called for the purpose of figuring out a plan by which the defendant could adjust its compensation system to meet the requirements of the Act, and that, in order to conform to the Act without increasing the base pay, the defendant was forced to reduce the base rate of pay to 34¢ an hour and pay its employees for all. hours over the maximum provided for in the Act at 51¢ an hour.

We think a similar situation existed in Walling v. Belo Corporation, supra, in which the Supreme Court affirmed the Circuit Court of Appeals in holding that the contracts were actual bona fide contracts of employment and that they were intended to, and did, really fix the regular rates at which each employee was employed. In that case the employer, prior to the effective date of the Act, October 24, 1938, had been paying its employees more than the minimum wage required by the Act.

After the enactment of the Act but before its effective date, the employer endeavored to adjust its compensation system to meet the requirements of the Act by negotiating a contract with each of its employees which provided that from and after October 24, the employee's basic pay would be 67¢ an hour (for example) for the first forty-four hours each week, and that for time over forty-four hours each week, the employee would receive for each hour of work not less than one and one-half times such basic rate, with a guaranty that the employee would receive weekly, for "regular time and for such overtime * * * a sum not less than $40."

Concerning employees Reddick and Passwater, it was stipulated that no change was made in the terms of their employment at the time the Act went into effect and that they continued to be paid at a straight time hourly rate, because the defendant held the view that they were retail salesmen and were not employees within the meaning of the Act. It was further stipulated that defendant's business, to a considerable extent, involved the interstate shipment of flour and grain.

There was evidence, and the court found, that these employees purchased for defendant wheat which farmers brought to the elevator from nearby points in Indiana. This wheat was received at elevator "A" and sent by Reddick and Passwater in a conveyor system to elevator "B", where it was prepared for milling and reconveyed to elevator "A", and from there Reddick and Passwater sent it to the flour mill where it was used in milling flour. In addition, there was evidence that these employees kept the machinery in defendant's plant oiled and in running condition.

██ The court concluded as a matter of law that Reddick and Passwater were engaged during their employment by the defendant in commerce within the meaning of the Act. We think the court was right.

The defendant contends that these employees were not within the Act, and its counsel points to § 13 of the Fair Labor Standards Act of 1938 which provides that "the provisions of sections 206 and 207 * * * shall not apply with respect to * * * any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in in-

trastate commerce." With this contention we do not agree.

██ To be within the Act, employees must be engaged in commerce or in "any process or occupation necessary to the production" of goods for commerce, as is evident by § 6 of the Act, since it applies to every employee "who is engaged in [interstate] commerce or in the production of goods for [such] commerce." Section 7 provides that "no employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce" longer than a certain period of each week. Section 3(j) provides that "for the purposes of this chapter [Act] an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, * * * handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

Under the state of the record in this case, it is clear that the activities of these employees brought them directly within the provisions of the Act, since they were engaged in occupations "necessary to the production" of goods for commerce. Kirschbaum v. Walling, 316 U.S. 517, 62 S. Ct. 1116, 86 L.Ed. 1638, and Warren-Bradshaw Drilling Co. v. Hall, 63 S.Ct. 125, 87 L.Ed. ——, decided by the Supreme Court, November 9, 1942.

The court also found as a fact that on various dates after October 18, 1938, defendant employed Lorin Beauchamp, Carroll Guilkey, Clifford G. Hiatt, Worth Hiatt, and Albert Shoof, and that at the time they were engaged, they were advised by the defendant that their rate of pay would be 40¢ an hour. As to Lorin Beauchamp and Clifford Hiatt, there was competent evidence to sustain the finding. There was no evidence to sustain the finding as to Carroll Guilkey, Worth Hiatt, and Albert Shoof.

The judgment is affirmed in part and in part reversed, and the case is remanded for further proceedings in conformity with this opinion.

SPARKS, Circuit Judge, concurs in the result.