FARGO GLASS & PAINT CO. v.
GLOBE AMERICAN CORP.

No. 10549.

United States Court of Appeals,
Seventh Circuit.

Feb. 4, 1953.

Earl B. Barnes, Hubert Hickam, Alan W. Boyd and Louis A. Highmark, Indianapolis, Ind., Ralph L. Read, Des Moines, Iowa (Winston, Strawn, Black & Towner, Chicago, Ill., Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., of counsel), George B. Christensen and Edward J. Wendrow, Chicago, Ill., for appellant.

Bernard N. Buchholz, Harry G. Fins and Edward Atlas, Chicago, Ill., for appellee.

Before KERNER, FINNEGAN and SWAIM, Circuit Judges.

FINNEGAN, Circuit Judge.

We considered and disposed of a prior appeal in this case on May 6, 1947, 161 F. 2d 811.

It then appeared that the original complaint of Fargo Glass & Paint Company, which sought to recover damages for cancellation by the defendant Globe American Corporation of a written contract with plaintiff, was dismissed by order of the District Court on defendant's motion. The written contract on which said complaint was based provided that Fargo was to buy from Globe for resale, within certain restricted territory, gas ranges manufactured by Globe and known to the trade under the name "Dutch Oven." We there reversed the judgment of the District Court and remanded the cause with directions to vacate the order of dismissal, to overrule Globe's motion to dismiss, and for further proceedings.

After remand the plaintiff, in this appeal the appellee, and hereinafter referred to as Fargo, filed an amended complaint containing seven counts and adding The Maytag Corporation as an additional defendant.

Counts one to four inclusive of the amended complaint alleged in substance that by entering into an agreement under which Globe agreed to sell its entire output of gas ranges to The Maytag Company for resale by the latter, and under which Maytag agreed to purchase its requirements of gas ranges from Globe, and in order to perform such contract Globe cancelled its prior tentative contract with distributors including Fargo, defendants violated sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2. It is also charged that The Maytag Company purchased and acquired 40% of the common stock of Globe, and in so doing violated section 7 of the Clayton Act, 15 U.S.C.A. § 18.

The fifth count sought to recover from Globe alone damages for the alleged breach of the contract declared upon in the original complaint. The sixth count sought to recover from the added defendant, Maytag, alone damages for alleged wrongful interference with said original Globe-Fargo contract. The seventh count sought to re-

cover from the defendant Globe alone expenditures alleged to have been made in performing the contract originally declared upon and sought also profits that would have been realized thereunder. Issue was joined on all counts, and the case was tried by the District Court without the intervention of a jury.

At the conclusion of the trial the District judge pointed out that there was no evidence to support counts five, six and seven and the plaintiff Fargo, through its attorney, waived all right of recovery on said counts. The trial court filed its findings of fact and conclusions of law on counts one to four inclusive, and entered judgment against the defendants, Globe American Corporation, and The Maytag Company, for $148,976.48. To reverse that judgment this appeal is prosecuted.

The appellants, Globe and Maytag, now contend: (1) that the arrangement between Globe and Maytag for the sale to the latter of Globe's entire output of gas ranges did not violate section 2 of the Sherman Act; (2) that the acquisition by Maytag of 40% of the common stock of Globe did not violate section 7 of the Clayton Act; and (3) that the measure of damages applied by the District Court was erroneous.

The appellee, Fargo, urges that the agreements and acts of the defendants constitute a conspiracy under section 1 of the Sherman Act and are violative thereof. It also contends that the acquisition by Maytag of 40% of the common stock of Globe violated section 7 of the Clayton Act.

█ A brief statement of the facts disclosed by the record will be of aid in the consideration of the contentions of the respective parties. Since the evidence material to the issues involved consists mainly of documents, depositions, answers to interrogatories and requests for admissions and oral testimony, which is almost entirely uncontroverted, the findings of fact entered by the District Court are not absolutely binding on this court. Murray v. Noblesville Milling Co., 7 Cir., 131 F.2d 470; Carter Oil Co. v. McQuigg, 7 Cir., 112 F.2d 275; Himmel Bros. Co. v. Serrick Corporation, 7 Cir., 122 F.2d 740.

It appears that the plaintiff-appellee, Fargo, is and was, at all relevant times, engaged in the business of buying and selling home appliances at wholesale. The defendant, Globe, was a manufacturer. It operated one plant at Macomb, Illinois, where it manufactured various types of agricultural equipment. A second plant was operated by Globe at Kokomo, Indiana, where it manufactured various types of stoves and ranges, including a gas range known to the trade as "Dutch Oven."

In 1940, Globe manufactured and sold between 7,000 and 8,000 gas ranges which was less than one percent of the total of such ranges sold in the United States. From 1942 to 1945, Globe was engaged in war work manufacturing life boats and other equipment for the Government. Late in 1944, and in the beginning of 1945, it began preparations to re-engage in the manufacture of gas ranges. It entered into tentative agreements with a number of wholesalers and some large retail dealers, including Fargo. Each of such tentative agreements stated that its object was to define certain territorial limits in which the named distributor or dealer was to sell, and to outline certain agreements pending the execution of a formal contract covering terms, payments, guarantees, and other subjects. Each such agreement, including that entered into with Fargo, dated July 26, 1945, provided:

> "It is mutually agreed that this is a statement of intention based on good faith between the Company and the Distributor and shall be cancelled either/or when superseded by formal contract covering all phases of the transaction or by either party giving written notice of such intention."

In June, 1945, long prior to any post-war production of gas ranges, certain of its stockholders were opposed to the re-entry by Globe into the gas range business. The head of the opposition group was chairman of Globe's Board of Directors, W. D. Harvey, who was the largest stockholder, owning with his wife approximately 30% of the outstanding stock. The remainder of the group, which joined in Harvey's dis-

sent, owned about 10% of the capital stock. The 60% of the capital stock remaining was in the hands of holders who were content to re-engage in the manufacture of gas ranges. Due to this conflict of opinion, it appears that in July, 1945, it was decided to attempt to sell, or otherwise liquidate, either or both the Macomb and Kokomo divisions.

In the latter part of July, 1945, an industrial broker suggested The Maytag Company as a possible purchaser, and brought representatives of Globe and Maytag together. After discussion and consideration, The Maytag Company was unwilling to purchase either Globe plant but was interested in any arrangement which would give it a satisfactory source of supply of gas ranges, and if such arrangement could be made Maytag was willing to purchase the Globe stock from its dissenting stockholders so that the manufacture of gas ranges might go forward.

Maytag did not desire to market a range under its own name, which was identical with a product being sold under another name, and it did not believe that Globe had the capacity to supply its requirements and at the same time manufacture gas ranges of a different type for their customers. As a matter of fact, Globe has never been able to supply Maytag with the number of ranges ordered except during the first six months of 1949 when there was a general depression in the sale of appliances. Globe was willing to enter into such an agreement because it would solve the problem which was preventing it from re-engaging in the gas range manufacturing business, and because it would furnish an assured outlet for its product if Maytag would agree to purchase all its requirements from Globe. Globe desired such provision because under the arrangement it would perhaps lose its identity as a manufacturer and be obliged to rely entirely on Maytag as a market.

Maytag was advised in the course of the negotiations concerning the tentative distributor and dealer agreements previously entered into by Globe, but was advised both by Globe and by its own counsel that since such agreements could be cancelled by Globe, they would not prevent the proposed arrangement from being made and carried out. As a result of these negotiations on September 19, 1945, Maytag purchased the stock of the Harvey group at book value in September, 1945, and concurrently an agreement was entered into between Maytag and Globe which extended to November 30, 1948, and was to continue thereafter until terminated by either party giving a twelve months' written notice. This agreement provided for the sale of Globe's entire output of gas and electric ranges, and repair parts therefor, to Maytag, and the purchase by Maytag from Globe of its requirements of such products for distribution and sale.

Globe then cancelled its tentative agreements with the distributors and dealers, including the agreement with Fargo by written notice. Globe has since manufactured gas ranges only for The Maytag Company, and Maytag has purchased its gas range requirements from Globe.

Globe is one of approximately seventy manufacturers of standard gas ranges in the United States. Prior to the war it had produced only a relatively small number of gas ranges. It did not produce any postwar gas ranges until more than a year after the arrangement with Maytag. In 1949, with the benefit of the Maytag name and the Maytag selling organization, the product which it manufactured ranked only eighteenth among the various gas range manufacturers with shipments constituting 1.96% of the national total. In 1950, it was twentieth with shipments constituting 1.82% of such total. By comparison, the leading ten manufacturers shipped approximately 52% of such national total.

The range manufactured by Globe is classified as a standard range and generally recognized as competitive with other standard ranges. It is equipped with a means of shutting off the oven vent, and the oven is so insulated as to retain heat for a substantially longer period than the ovens of most other ranges; this feature has been stressed in its advertising as a means of gas saving for foods requiring a long period of cooking. All gas range ovens retain heat

to varying extents, but at the time this case was tried only one other manufacturer was featuring heat retention in its oven. However, no manufacturer desiring to produce and sell ranges having an oven with such features was in any respect precluded from doing so, since the mechanical means of effecting such results are fully covered in the expired patent art. The range manufactured by Globe had an automatic oven time clock shut-off. Substantially all other standard ranges have available automatic turn-on and shut-off mechanisms for the oven, and no patent prevents the incorporation and use of such a mechanism; the only other range advertised as having heat retention has not used the automatic shut-off feature. Globe, therefore, advertised its product as the only gas range which automatically shuts off the gas and continues to cook on retained heat. Substantially all manufacturers of gas ranges advertise features of some type as exclusive.

On October 15, 1945, approximately two weeks after Globe cancelled the tentative agreement with plaintiff, and long before any gas ranges were available on the postwar market, plaintiff entered into a distributor agreement with Grand Home Appliance Company for the distribution of the latter's line of "Grand" gas ranges in a territory similar to that provided for in the Globe tentative agreement. The Grand range is also a standard range and a competitor of the range manufactured by Globe. Grand advertises and stresses as exclusive features of its gas range, a broiler utilizing ceramics for developing intense broiling temperatures, and a safety device for shutting off the gas to the top burners. It also has available for its range, automatic oven controls to turn gas on and off. Grand gas ranges had been sold generally in the plaintiff's territory prior to the war and enjoyed a good name and reputation there, whereas there were no distributors of Globe gas ranges in that territory during that period, and few, if any, Globe gas ranges had been sold there. Maytag had sold its washers and ironers for many years in the Dakota territory. Its name was well known there and it has had a reputation for quality and service which would attach as an important sales feature to any product sold by it under its own name.

During the "sellers' market" in the years 1946, 1947 and 1948, plaintiff was able to and did sell all of the gas ranges it was able to obtain from Grand. Its sales of Grand gas ranges during those years were: 1946, a total of 67 ranges; 1947, a total of 393 ranges; 1948, a total of 633 ranges. Up to and including the time of the trial, plaintiff continued to act as a distributor for the Grand range and realized substantial profits therefrom.

The judgment entered was for the entire amount of Maytag's net profit from the sale of gas ranges in the territory specified in the plaintiff's tentative agreement from September 19, 1945 to January 28, 1951. The latter date has no special significance except that it was arbitrarily selected by plaintiff as the date to which it brought down its evidence as to Maytag profits from the sale of gas ranges in such territory.

The tentative agreement between Globe and Fargo contained a provision restricting the proposed distributor from handling other gas ranges in the same price range. The Fargo agreement with Grand contained a similar provision. In connection with the District Court's conclusion as to the measure of damage it found, that such restriction in the tentative agreement violated section 3 of the Clayton Act, 15 U.S.C.A. § 14, and that plaintiff had the right to, and contemplated handling gas ranges in addition to Dutch ovens. No such finding was made with respect to the agreement with Grand.

It should also be noted that in this record there is no allegation or proof of price fixing. Fargo is alleged to have obtained 154 dealers who were ready to handle Dutch oven gas ranges in its territory. Not one of such dealers joined with Fargo in prosecuting this suit, or claims to have been damaged by the dealings between Globe and Maytag. This in spite of the fact that on October 3, 1945, Fargo issued a notice on its own letterhead, addressed to all Dutch oven distributors, the purpose of which was to request their prompt reply "as to whether you will join with us on a pro rata cost

basis to be shared equally by each distributor if our counsel advises us that we have good and sufficient grounds for action. Only such distributors who join in this suit would share in any benefit of such action."

The respective contentions of the appellant and appellee make it necessary to decide whether or not the arrangements between Globe and Maytag violate sections 1 and 2 of the Sherman Act, and section 7 of the Clayton Act.

Section one (1) of the Sherman Act declares every contract, combination or conspiracy in restraint of trade among the several states, to be illegal and provides penalties to be imposed upon those who make or enter into such contracts, combinations or conspiracies. 26 Stat. 209, 15 U.S.C.A. § 1.

Section 2 of the Sherman Act provides:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, * * *." 15 U.S.C.A. § 2.

Section 7 of the Clayton Act, 38 Stat. 731, as originally enacted, provided:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce." 15 U.S.C.A. § 18.

By Act of December 29, 1950, section 7 of the Clayton Act was amended generally so as to prohibit the acquisition of the whole or any part of the assets of another corporation when the effect of the acquisition may substantially lessen competition or tend to create a monopoly. 15 U.S.C.A. § 18 and historical note.

The District Court, 101 F.Supp. 460, 464, in its findings numbered 42 and 43, said:

42—"Since September 19, 1945, to the present time, all of said 65 distributors, including Fargo, and said 45 key dealers, and all other persons, were excluded from the distribution of Dutch Ovens * * *."

43—"The said exclusion was an undue and unreasonable restraint of interstate trade and commerce."

Maytag was not a distributor of Dutch ovens. It bought all the ovens manufactured by Globe and re-sold them on its own account. Ovens shipped and billed to Maytag between the 1st and 15th days of any month were to be paid for on the 25th day of the same month, those shipped from the 16th to the end of the same month were to be paid for by the 10th day of the succeeding month.

Finding 43 is a mere conclusion of law and not binding on this court.

In United States v. Columbia Steel Co., 334 U.S. 495, on page 522, 68 S.Ct. 1107, on page 1121, 92 L.Ed. 1533, the Supreme Court said:

"A restraint may be unreasonable either because a restraint otherwise reasonable is accompanied with a specific intent to accomplish a forbidden restraint or because it falls within the class of restraints that are illegal *per se*. For example, where a complaint charges that the defendants have engaged in price fixing, or have concertedly refused to deal with nonmembers of an association, or have licensed a patented device on condition that unpatented materials be employed in conjunction with the patented device, then the amount of commerce involved is immaterial because such restraints are illegal *per se*. Nothing in the Yellow Cab case supports the theory that all exclusive dealing arrangements are illegal *per se*."

83 A.L.R. contains an annotation on page 1173 entitled: "Contract by one party to

sell his entire output to, or to take his entire requirements of a commodity from, the other as contrary to public policy or antimonopoly statutes." It points out:

"In determining whether a contract to sell the entire output of a mine or industrial plant to another, or a contract to purchase the entire requirements of a business of another, offends the antimonopoly statutes or public policy, there is to be taken into consideration the effect and purpose of the contract. Where such a contract has for its object a legitimate purpose, and it only incidentally stifles trade, it is not within the inhibition of the statute or of the rules of public policy. In determining whether a contract is in violation of antimonopoly laws, where it is not on its face violative of the act, the inquiry relates to the circumstances and conditions under which it was made, including the relationship of the parties and their relations to the subject-matter dealt with, and its relation to the general public."

Among the cases cited in the annotation is Carter-Crume Co. v. Peurrung, 6 Cir., 86 F. 439, affirmed in 6 Cir., 99 F. 888. There the court sustained the validity of a contract by an independent manufacturer for the sale of the entire output of his plant. There was no evidence that the seller knew that the buyer had made similar contracts with other manufacturers or that the contract was intended by the buyer as a step in a general scheme for monopolizing the trade in the subject matter thereof and controlling the price.

■ In the case at bar there is neither allegation nor proof that Maytag intended to monopolize the trade of selling gas ovens, or to control the price of such appliances. The record contains no evidence that Fargo, since the Globe-Maytag agreement, has attempted to procure, or been denied the right to procure, Dutch oven gas ranges required for *bona fide* needs of its trade in the distribution of appliances. As a matter of fact, two of the dealers who had signed application for Globe appliances at the request of Fargo, testified that they

were selling Maytag appliances, including gas ranges, within the restricted territory mentioned in its tentative agreement of Fargo with Globe.

We are of opinion that under the facts and circumstances disclosed in this record the contract and arrangements between Globe and Maytag did not violate sections 1 and 2 of the Sherman Act, or section 7 of the Clayton Act.

Both the Sherman Act and the Clayton Act made provision for civil suits for damages by persons injured by violation of the respective enactments. These provisions are superseded by sec. 4 of the Act of October 15, 1914, 38 Stat. 731, which provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee." 15 U.S.C.A. § 15.

■ In the case at bar, the District Court found that Maytag made a net profit from the sale of Dutch ovens in the restricted territory in the amount of $39,-560.36, and entered judgment for three times that amount and found $30,000 as plaintiff's allowable attorney's fee, and also fixed costs in the sum of $295.40.

Since we have concluded that no violation of the antimonopoly laws is involved, we might dismiss the contention that the damages awarded plaintiff were improperly measured as unnecessary to decide. We feel, however, that the contention is well founded.

The profits made by Maytag are not the proper measure of plaintiff's damages. There is no evidence to justify the assumption that plaintiff would have sold the same number of Globe ranges that Maytag sold, or that it would have realized the same profit on sales it made. The record is silent as to the comparative cost of doing business by Maytag and plaintiff. Damages to

be recoverable must be actual not specula-tive, remote or uncertain. Central Coal & Coke Co. v. Hartman, 8 Cir., 111 F. 96, 97.

Moreover, the claim of plaintiff that it had procured orders, prior to cancellation of the tentative agreement with Globe, from dealers in its territory for the purchase of Dutch ovens is directly contra-dicted by the testimony of two of such dealers which it had procured, as well as by a hand-writing expert called by the defend-ant.

The expert said that in his opinion the same person inserted the written number in 117 of the 126 dealer applications where the application stated:

> "If we receive the Dutch oven fran-chise we will place an order of ......
> ranges to be shipped at your conven-ience."

The judgment of the District Court is reversed and the cause remanded with di-rections to dismiss the complaint.*

* Judge Kerner participated in the hearing, consideration and decision of this case but died prior to the announcement of this opinion.